# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT NASHVILLE

### FEBRUARY, 1998 SESSION



**FILED**

June 10, 1998

**Cecil W. Crowson**
**Appellate Court Clerk**

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | No. 01C01-9612-CR-00535 |
| | ) | |
| Appellee | ) | |
| | ) | Davidson County |
| vs. | ) | |
| | ) | Honorable Walter C. Kurtz, Judge |
| | ) | |
| **ELECTROPLATING, INC., and** | ) | |
| **ROSS CUNNINGHAM,** | ) | (Violation of the Water Quality Control |
| | ) | Act of 1977) |
| Appellant. | ) | |

FOR THE APPELLANT:

JERRY D. HUNT (Trial only)
102 E. Main St.
P.O. Box 812
Lebanon, TN 37088-0812

BOB LYNCH, JR. (Trial and Appeal)
Suite 316
Washington Square
222 Second Ave. North
Nashville, TN 37201

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

ALBERT L. PARTEE, III
Senior Counsel
425 Fifth Ave. North, 2nd Floor
Nashville, TN 37243-0493

VICTOR S. JOHNSON III
District Attorney General

JOHN SEABORG
JOHN A. MOORE
Assistant District Attorney Generals
Suite 500
Washington Square
222 2nd Ave. North
Nashville, TN 37201-1649

OPINION FILED: _____

**CONVICTION AND SENTENCE AFFIRMED**
**STATE'S APPEAL DISMISSED**

CURWOOD WITT,
JUDGE

**OPINION**

The appellant, Ross Cunningham, appeals his conviction for willfully failing to comply with the Tennessee Water Control Act of 1977 by discharging chromium into the Metropolitan Government Sewer System on September 5, 1994, a class E felony.[1] After the Davidson County jury returned a guilty verdict, the trial court sentenced the defendant to the minimum one-year sentence and a fine of $10,000. The trial court suspended the sentence and ordered Cunningham to serve two years on probation including 800 hours of community service and, in addition, required a cash bond securing payment of his fine and the costs. In this appeal pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure, Cunningham alleges that:

1.  The trial court erred when it denied his motion for judgment of acquittal at the close of the state's proof and in the motion for a new trial.

2.  The trial court erred by admitting evidence of the defendant's prior bad acts.

3.  The trial court erred by admitting extrinsic evidence of specific instances of conduct to impeach the defendant's credibility.

4.  The trial court erred in allowing the defendant to stand trial for the same charges both as an individual and as a corporate defendant.

5.  The trial court erred in denying the defendant's request that he be granted judicial diversion under Tennessee Code Annotated section 40-35-313.

The state also raises an issue in this appeal. It contends that the trial court erred by not requiring the defendant to pay restitution.

---

[1]    The grand jury issued a three-count indictment against Cunningham and his closely held corporation, Electroplating, Inc. Both defendants were charged with violating Tennessee Code Annotated sections 69-3-114(b) and 69-3-115(c) by discharging chromium on September 4, 1994 (Count 1), and with feloniously and knowingly causing property damage to Metropolitan Government's sewer system in violation of Tennessee Code Annotated section 39-14-408 (Count 3). In the second count, the corporation was charged with the willful discharge of chromium and nickel between September 9 - 12, 1994. The jury found Cunningham guilty on the first count but acquitted him on the third. The corporation did not make an appearance in the trial court and was convicted of all three counts and received fines amounting to $169,480.16. Electroplating, Inc., is not a party to this appeal.

2

We have reviewed the record and the law in this rather unusual case. Because the state does not have the right to appeal a trial court's failure to order restitution, the state's appeal is dismissed. See Tenn. Code Ann. § 40-35-402 (1997). Finding no error warranting reversal of Cunningham's conviction or any modification of his sentence, we affirm the judgment of the trial court.

## Facts

Because of the complexity of the factual issues in this case, we discuss the facts in detail. During the early morning hours of September 6, 1994, an employee of the Metro Water Services Department at the Dry Creek facility took a sample from the Old Hickory line and noticed that the sample was yellowish-orange rather than its normal brown color. The employee preserved a gallon of the orange liquid, and later, James Pogue, a chemist for Metro Water Services, took the sample to the Central Waste Water Treatment Plant for analysis of its metals content.

Based on his knowledge and experience, Pogue immediately identified two possible sources for the discharge in the Old Hickory/Lakewood area. The first company he visited was Chem-Plate where he met with the owner and informed him of the discharge. Chem-Plate's owner stated that he had had no spills in the past couple of days, and on a walk-through of the plant Pogue found no evidence of anything similar to the sample taken at the treatment plant. The second company he visited was Electroplating, Inc., where he met with Ross Cunningham, the owner. Cunningham told Pogue that he had closed the plant due to the deteriorating condition of the roof. He denied any responsibility for the discharge and explained that he had been out of town until late in the evening on September 5.[2] Pogue testified that he was able to eliminate Chem-Plating as the source of the discharge rather quickly. First, the analysis of the sample taken at the treatment plant showed that the discharge contained a high concentration of chromium, and

---

[2] In 1994, Labor Day fell on the fifth of September.

3

he knew that Chem-Plate did no chrome plating. Second, after examining a sewer plat map of the Lakewood Sanitary Sewer System, Pogue found that Chem-Plating and Electroplating, Inc., were on the opposite sides of a hill which prevented the sewer flow from the two plants from combining until they were out of the Lakewood district.[3]

Pogue then concentrated his attention on the Electroplating facility. On September 7, he and William Bryant, a senior chemist for the Metro Water Service, returned to conduct an inspection. During this inspection, they found two plating tanks at the back of the building. One tank was empty except for some yellow-orange sludge at the bottom, and the other contained approximately 250 gallons of a yellow-orange solution. The official discharge point for the plant's waste water was a shallow manhole directly behind the facility. The inspectors were unable to take a sample from this manhole because it was completely dry.

The official discharge point, however, connects to manhole 68 which also receives the sanitary discharges from the plant's bathroom and sink. Only Electroplating is connected to manhole 68. No sample was taken from this manhole. Sewage from number 68 flows approximately 268 feet to manhole 15 into which four residences also empty their sewage. Gravity flow carries the sewage through manholes 13, 14, and 17 and ultimately to the Lakewood and Old Hickory Pumping Stations. While Pogue was inspecting manhole 15 on September 9, a yellow-orange substance flowed through the manhole, and he was able to secure a sample. To provide for continuing observation, an automatic sampler that took samples at regularly scheduled intervals was installed that same day.

On September 12, Pogue returned to manhole 68. He found a blueish-green liquid in the bottom of the manhole. Although no samples from this

---

[3] Flow from the Lakewood area goes first to the Lakewood Pumping Station, then to the Old Hickory Pumping Station, and finally to the Dry Creek Wastewater Treatment Plant.

4

site were analyzed, he presumed that the liquid contained a concentrate of nickel because of the color. The concrete in the manhole had been eaten away by what appeared to be some type of acid. Pogue testified that out of the thousands of manholes he had seen, he had never found one as corroded and eaten away as this one. Later, Pogue stated that Ferguson Harbor, an environmental clean-up company, had removed the metal-bearing waste found in the sewer line near manhole 68 at a cost of $7,413.60.[4]

Pogue and Bryant made another inspection of Electroplating's plant on September 14. Cunningham allowed them to walk through the plant but denied permission to take pictures. During this visit, Cunningham stated that, although he had dumped some "stuff" before, he was not responsible for the current problem.

At trial, Bryant explained the Metro Water permit system. Users that discharge more than 25,000 gallons per day or that discharge pollutants must have an industrial user's permit. Electroplating's permit was issued on March 15, 1994 and was effective through March 15, 1997. The permit defines the amount of various pollutants that may be discharged into the sewer system, spells out the methods to be used for collection and analysis of samples, and requires that certain records be kept. Electroplating's permit specifically limits the amount of chromium, nickel, copper, zinc, cadmium and other metals the plant could discharge into the system both at a given moment of time and in a twenty-four hour period. For example, the 'grab' sample limit on chromium was ten parts per million (ppm) and the limit for a twenty-four hour composite sample is five ppm. Dry Creek Water

---

[4] Pogue also testified to other expenses incurred by the Metropolitan Water Service as follows:

Personnel costs: $2,280.16
Analytical costs: $3,060.00
Mileage: 111.25

On cross-examination, Pogue conceded that these items resulted in no extra outside cost to Metro Water Service as the personnel costs were for payroll, the mileage was incurred in government-owned vehicles, and that the analyses were performed in a Metro Water Service's laboratory.

Treatment Plant also has limits which it cannot exceed.

The state introduced the test results from three different samples: #1520, the original sample taken on September 5 at Dry Creek; # 1556, the 'grab' sample taken on September 9 from manhole 15; and #1567, the composite sample obtained from the automatic sampler on manhole 15 from September 9 through September 12. Sam Seged, a laboratory chemist employed by Metro Water Services, testified that he analyzed each sample for the presence of various metals including chromium, nickel, copper and zinc. The reported results, expressed in part per million, and the permit limits are compared in the table below. The limits in #1520 are from the limits imposed on influent at the Dry Creek treatment plant. The other two samples are compared to the limits in Electroplating's permit.

| #    | Type      | Chromium | Limit | Nickel | Limit | Copper | Limit | Zinc | Limit |
|------|-----------|----------|-------|--------|-------|--------|-------|------|-------|
| 1520 | grab      | 560      | .51   | 16     | .32   | 11     | .52   | .4   | .43   |
| 1556 | grab      | 400      | 10    | 23     | 10    | 2.5    | 10    | 3.1  | 10    |
| 1567 | composite | 450      | 5     | 1300   | 5     | 160    | 5     | 130  | 5     |

According to William Bryant, once sewage at the treatment plant exceeds the limitations there is a possibility for environmental harm. Not only would the Cumberland River be harmed, but the toxicity of the metals could destroy the biological activity at the treatment plant itself and, as a result, the treatment system could fail. Bryant also concluded from the data that there were two separate discharges represented by samples 1520 and 1567. He described samples 1520 and 1556 as having the same "fingerprint" and, therefore, he considered them to be representative of the same spill. The first discharge was high in chromium with smaller amounts of the other metals; the second discharge, on the other hand, was extremely high in nickel. The state's experts conceded that it was possible that a backflow from the area below manhole 15 could occur; however, such a backflow was extremely unlikely except during periods of heavy rain. James Pogue explained that the yellow-orange flow he observed in manhole 15 on September 9 was probably caused by liquid emptied into the line earlier but trapped in a low spot.

When a new surge of liquid passed through the line, the trapped discharge was released. On cross-examination, Bryant acknowledged that anything discharged from the plant had to pass through either the official discharge point or manhole 68 or both and that he had no direct proof that such a discharge had occurred.

James North, an environmental consultant, testified that it would have cost approximately $9,000 for an electroplating company to dispose legally of 1,750 gallons of spent nickel and chrome plating waste.[5] He also testified to the toxic effect of such metals which can eat through the concrete and masonry of sewer lines, contaminate water supplies downstream from the discharge, and negatively affect the wildlife as well as the surface and ground water of the area involved.

Three non-expert witnesses concluded the state's case. Bill Crusenberry testified that at about 1:00 p.m. on September 5 he saw Ross Cunningham standing near his pickup truck behind the plant. Crusenberry had known the defendant for years and was familiar with the truck. Jack Barnes owned a garage across the street from Electroplating. He testified he had known the defendant since the late seventies. He described the condition of the facility as "needing a lot of work." He said that the roof was in particularly bad shape and leaked terribly. In the past, he had noticed that, during a heavy rain, a yellowish-orange liquid would run out of the door of the plant and across the street.

The last witness, Billy Clark, was a former employee of Electroplating. During a jury-out hearing, the state offered the testimony of Clark, Miller Jakes, former codes director for the city of Lakewood, and Ann Rochelle, an environmental specialist for the State Department of Environment and Conservation. Cunningham also testified briefly. The trial court found Clark's testimony admissible under rule

---

[5] The defendant objected to this testimony as based on facts not in evidence. The trial court overruled the objection finding that a hypothetical does not have to be absolutely accurate and that the evidence was relevant to prove motive. The defendant has not raised this issue on appeal.

7

404(b) of the Tennessee Rules of Criminal Procedure. He refused to allow the other two witnesses to testify unless something in the defendant's proof "opened the door."

Before the jury, Clark described the process by which Electroplating had plated chrome and nickel parts. He also testified that during rainy periods, Cunningham would open the valve on the bottom of the rinse tank. The rain falling through the roof would wash the solution out the door, down the road and into a storm drain. During the ten years he worked at the plant, he said that the rinse tank had been emptied a few times in this manner. He also described the trench drain and sump pump that he helped the defendant install in front of the doorway approximately five years before the plant closed. The solution would flow across the floor into the trench drain where it would be pumped through a filtration system and then collected in another tank. On cross-examination Clark admitted that he had "caught an attitude" when he was laid off without any severance pay. He said he was "dropped like a hot potato" when Cunningham suddenly decided to close the plant. At the close of Clark's testimony, the judge instructed the jury that the evidence of Cunningham's prior acts were to be considered for the limited purpose of determining the defendant's intent, knowledge, and/or absence of accident and could not be used to prove the defendant's disposition to commit the crimes for which he was on trial.

After the state rested, the trial court reduced the vandalism charge involving damages in excess of ten thousand dollars to one for which the damages were less than ten thousand.[6] The defense did not move for a judgment of acquittal on the first count of the indictment.

---

[6] As originally charged, the vandalism would have been a class C-felony. The trial court allowed the jury to determine whether the defendant was guilty of a D or E felony or a misdemeanor. The jury acquitted the defendant of this charge.

Ross Cunningham took the stand in his own defense. He denied that he had dumped any toxic materials on September 5. Although he acknowledged that some waste material had flowed out the door in the past, he insisted that the spillage had ceased once the trench drain and sump pump were in place. He testified about his process for recycling the waste from the rinse tanks. He had patented a process which removed contamination from the rinse water and had used the system for the past several years. When spillage occurred in the facility everything went through the sump pump and filter via the trench drain. The process removed the metals, and the water was then returned to the pretreatment tank. The metals could then be returned to the plating tanks and reused. He testified that he had performed no zinc plating and had no zinc in his shop. He reiterated on cross-examination that his shop contained no zinc.

The defense offered the expert testimony of Donald Pearson, a former chemistry professor at Vanderbilt University. Pearson testified that he had examined the defendant's patent and conducted an experiment using the process. He found that the process did in fact work to remove chromium from the water. In his experiment, the chromium was reduced to six parts per million. However, Pearson acknowledged that he had never seen the process at work in the plant and had tested it only under laboratory conditions. At this point the defense rested.

After the jury left the courtroom, the state moved for admission of certain evidence to rebut the defendant's direct testimony that there was no zinc in his plant and that he had never emptied any contaminated material into the sewer system. The evidence, which consisted of laboratory analyses performed on samples taken from inside the plant, had been suppressed prior to trial.[7] After considerable discussion the court ruled that the result of only one test was

---

[7] The record does not contain either the motion to suppress or the transcript of the suppression hearing. From the comments made during the jury-out hearing at trial, we gather that five samples were taken from inside the plant without a valid warrant and that the trial court suppressed the results. One of the tests clearly indicated that zinc was present in sludge found in the toilet bowl.

admissible and was limited to impeachment purposes. The prosecution then recalled James Pogue and Samuel Seged. They testified that the sludge taken from the toilet bowl in the boarded up lavatory contained 16 parts per million of zinc as well as smaller amounts of chromium and nickel. The trial judge instructed the jury that this testimony was admissible only on the issue of the defendant's credibility.

The state then called Sherman Reeves who lived down the street from the Electroplating plant and passed it every day. He testified that between 1989 and 1994 he had observed some unusual blue-green or orange liquid coming from the plant on 20 or 30 different occasions.

The defense then recalled Ross Cunningham who again testified that his plant did not perform any zinc plating. He explained that when items containing zinc were placed in the plating tank, the solution would pull impurities such as zinc into the bath. Over a period of time, the zinc in the solution would build up. Cunningham also testified that prior to plating, zinc diecast products and pot metal required polishing. Dust from the process settled onto everything including the toilet bowl. He reiterated that after the installation of the trench drain, no contaminated liquid had escaped from the plant. On cross-examination, he said that he had not plated any zinc since 1982 and that any zinc in the shop was a by-product of the process.

Based on this evidence, the jury found Ross Cunningham guilty of willfully discharging chromium into the Metropolitan Government Sewer System on September 5, 1994 as charged in count one of the indictment but acquitted him of the vandalism charge in count three. The jury returned guilty verdicts against the corporation in all three counts.

**Denial of the Defendant's Judgment of Acquittal**

10

The framing of this issue has produced some confusion on appeal. The defendant contends in his brief that the state failed to prove that he willfully discharged chromium contaminated waste into the sewer system and that, therefore, the evidence is insufficient to sustain the jury verdict. The issue, on the other hand, is framed as whether the trial court erred when it denied the defendant's motion for judgment of acquittal at the close of state's proof and in the subsequently filed motion for new trial. The record shows that the defendant did not move for a judgment of acquittal with respect to the first count of the indictment at the close of the state's proof. After the jury left the courtroom, defense counsel said, "Your Honor, at this time, we'd ask for a -- we make a motion for judgment of acquittal on the vandalism charge. There has been no proof of damages to the Metropolitan system whatsoever." The trial court partially granted the defense motion by reducing the charge to no greater than a D felony. We need not review the trial court's action because the jury acquitted the defendant of the charge of vandalism and our consideration would be moot.[8]

However, nothing in the rules requires the defendant to raise the sufficiency of the evidence either in a motion for judgment of acquittal or in the motion for new trial in order to preserve the issue for appellate review. The Tennessee Rules of Appellate Procedure provide that

> in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a

---

[8] The state contends that the defendant waived this issue because he presented evidence on his own behalf rather than standing on the motion. Rule 29(a) of the Tennessee Rules of Criminal Procedure provides that a defendant may offer evidence after the trial court denies a judgment of acquittal without having reserved the right. If the jury returns a guilty verdict or is unable to reach a verdict, the defendant may immediately make or renew a motion for judgment of acquittal. Tenn. R. Crim. P. 29(c). In the alternative, the rule permits the defendant to include the motion for a judgment of acquittal in a timely motion for new trial. Id. In this instance, the defendant raised the issue in his motion for new trial. Moreover, as discussed above, a defendant may raise the issue of the sufficiency of the evidence for the first time on appeal.

11

motion for new trial. . . .

Tenn. R. App. P.3 (e) (emphasis added). When the issue, if found to be meritorious, would result in dismissal of the prosecution against the accused, the Rule 3 waiver provision does not apply. State v. Keel, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994). If this court determines that the evidence in the record is insufficient to sustain the jury's verdict, no new trial will result. The charge must be dismissed. Thus, the sufficiency question is subject to review even if the defendant had not raised it in his motion for new trial.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is, whether after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S. Ct. 2781, 2789 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). Since a jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, a convicted defendant has the burden of demonstrating on appeal that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining that sufficiency, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). It is the appellate court's duty to affirm the conviction if the evidence, viewed under these standards, is sufficient for any rational trier of fact to find the essential elements of the offenses beyond a reasonable doubt. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); Tenn. R. App. P. 13(e).

We find that the evidence in this case, when reviewed according to these standards, is sufficient to sustain the defendant's conviction for willfully

12

discharging chromium into the Metropolitan Government's sewer system on September 5, 1994 in violation of Tennessee Code Annotated sections 69-3-114(b) and 69-3-115(c). In pertinent part, section 69-3-114 states:

> In addition it shall be unlawful for any person to act in a manner or degree which is violative of any provision of this part or of any rule, regulation, or standard of water quality promulgated by the board or of any permits or orders issued pursuant to the provision of this part. . . .

Tenn. Code Ann. § 69-3-114(b) (1987). If a violation occurs, section 69-3-115 provides the penalty:

> Any person who . . . willfully and knowingly unlawfully pollutes the water of the state or willfully fails, neglects, or refuses to comply with any of the provisions of this part shall be guilty of a felony and shall be punished by a fine of not more than twenty-five thousand dollars ($25,000) or imprisonment not to exceed two (2) years or both.

Tenn. Code Ann. § 69-3-115(c) (Supp. 1994).

The indictment charged that Ross Cunningham "did willfully fail to comply with the Tennessee Water Quality Control Act of 1977 by discharging chromium contaminated waste into the sewer system of the Metropolitan Government of Nashville and Davidson County in violation of the industrial user permit issued to Electroplating, Inc." Therefore, the evidence presented at trial must demonstrate beyond a reasonable doubt that

1.  A discharge of chromium-contaminated waste into the Metro Government's sewer system occurred.

2.  The discharge was a violation of Electroplating, Inc.'s industrial user permit issued pursuant to the Tennessee Water Quality Control Act of 1977.

3.  The defendant, Ross Cunningham, willfully caused the discharge.[9]

---

[9] This court has generally equated the mens rea of 'willful' with 'intentional' as defined in Tennessee Code Annotated section 39-11-302(a). See, e.g., State v. Bordis, 905 S.W.2d 214, 224 (Tenn. Crim. App. 1995); State v. Fredrick Sledge, No. 02C01-9405-CR-00089, slip op. at 15 (Tenn. Crim. App.,

13

At trial, the defendant did not challenge the state's evidence demonstrating that a discharge of chromium occurred. Nor did he question that such a discharge would violate the provisions of the industrial user permit. The evidence that such a discharge occurred is overwhelming. A copy of Electroplating's industrial user permit containing the limitations was placed into evidence. The analysis of the sample taken at the Dry Creek treatment plant in the early morning hours demonstrates beyond a reasonable doubt that the waste discharged contained chromium far in excess of the permissible amount.[10]

The major issue at trial was whether the illegal discharge was the result of Ross Cunningham's willful and knowing act. On appeal, Cunningham contends that the record contains no evidence that any contaminated sewage was discharged through either the official discharge point or manhole 68, the only two locations through which sewage from Electroplating could enter the system. It is true that no samples were taken from either the discharge point or from manhole 68 and that the state presented no direct evidence that Cunningham was the perpetrator.[11] Circumstantial evidence, however, does point unerringly to the Electroplating facility as the source of the contamination and to Cunningham as the person responsible for the discharge.

A criminal offense may be established exclusively by circumstantial evidence. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1973); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995); State v. Lequire, 634 S.W.2d

---

Jackson, Nov. 24, 1997), perm. app. filed (Tenn. January 12, 1998); Mark Steven Johnson v. State, No. 01C01-9212-CR-00408, slip op. at 5 (Tenn. Crim. App., Nashville, Sept. 2, 1993).

[10] The influent at Dry Creek may contain no more than .51 parts per million of chromium. Even though the discharge had been greatly diluted by the time it reached the treatment facility, the chromium still exceeded the permissible amount by more than a thousand times.

[11] Pogue testified that no sample could be taken at the official discharge point because it was dry. The record does not indicate why no sample was taken at manhole 68. Photographs in evidence show that on September 9, manhole 68 contained a bluish-green liquid.

608 (Tenn. Crim. App. 1981).  However, the evidence must not only be consistent with the guilt of the accused but inconsistent with innocence and must exclude every other reasonable theory or hypothesis except that of guilt.  If the trier of fact can determine from the proof that all other reasonable theories except that of guilt are excluded, the evidence is sufficient. State v. Tharpe, 726 S.W.2d at 900; State v. Jones, 901 S.W.2d at 396.  Inferences to be drawn from circumstantial evidence are within the province of the trier of fact, and this court may not substitute its inferences for those drawn by the jury from the evidence. Liakas v. State, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993).

When Pogue conducted a walk-through of the facility on September 7, 1994, he found two plating tanks at the back of the plant.  One was empty except for a yellow-orange sludge at the bottom, and the other contained approximately 250 gallons of a yellow-orange solution.  The only other possible source of contamination in the relevant area was the operation at Chem-plate.  Pogue's inspection of that plant on September 7 found nothing that would have caused the high concentration of chromium present in the influent at Dry Creek.  Moreover, Chem-plate did no chrome plating.  Two days later, while Pogue was inspecting manhole 15, another yellow-orange substance flowed through the manhole.  Sewage from only five users flows through manhole 15.  Four of these sources were residential users.  The fifth was Electroplating's plant, a facility where chrome plating had represented a major portion of the business.  From these facts, a jury could have reasonably inferred that the source of the discharge was indeed the Electroplating plant.

Ross Cunningham was the sole owner of the corporation.  He managed the operation of the plant and was intimately involved in its day to day operations.  He described himself as an inorganic chemist, and he had many years of experience in the plating business.  Just prior to the discharge, Cunningham

15

closed the plant because of the condition of the roof and announced his decision to retire. According to the environmental consultant, legal disposal of a full tank of plating solution or rinse bath would have cost the corporation several thousand dollars. Although the defendant at first told the inspectors that he was out of town until late in the evening on Labor Day, a witness who was well-acquainted with the defendant saw him standing in back of the plant at approximately 1:00 p.m. At trial, the defendant admitted that he had come to the plant at about 5:00 p.m. to pick up his truck. Billy Clark, a employee of Electroplating for approximately ten years, testified that many times he had seen Cunningham open the valve on the rinse tanks and allow the liquid to run out the door. Jack Barnes, the owner of a nearby garage testified that he had seen orange or blue-green liquids running across the road. Although neither Clark nor Barnes provided any dates for these events, Sherman Reeves, who lived nearby, testified that he had seen a rust-colored liquid being discharged from the premises twenty or thirty times between 1989 and 1994.[12] Although no eyewitness actually saw Cunningham run the waste water into the sewer system, the facts presented at trial place him on the scene during the critical time period. Because the business was closed, he was the one person with access to the tanks, and it is reasonable to conclude that he would need to dispose of the plating solutions and rinses. He had the knowledge and experience required to handle the dangerous materials. He would profit by their disposal. In this instance, the facts and circumstances are such that the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt. State v. Jones, 901 S.W.2d at 396.

After reviewing the facts presented at trial, we find that the evidence is legally sufficient to convict the defendant of willfully discharging chromium contaminated waste into the sewer system of the Metropolitan Government of Nashville and Davidson County in violation of the industrial user permit issued to

---

[12] Cunningham testified that since the trench drain and sump were installed in 1989, no liquid discharges left the plant.

Electroplating, Inc.

## Evidence of Prior Conduct - Rule 404(b)

The defendant contends that the trial court should have excluded the testimony of Billy Clark who stated that he had seen the defendant open the valves on the rinse tanks during rainy periods and let the contaminated water flow out the door. The general rule is that evidence of prior conduct is inadmissible, especially when previous crimes or acts are of the same character as the charged offense, because such evidence is irrelevant and invites the "finder of fact to infer guilt from propensity." State v. Hallock, 875 S.W. 2d 285, 290 (Tenn. Crim. App. 1993). Moreover, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b).

In this case, the trial court found that the evidence was admissible under the exceptions found in Rule 404(b). The rule permits the admission of evidence of prior conduct if the evidence of other acts is relevant to a litigated issue such as identity, intent, or rebuttal of accident or mistake, and the probative value outweighs the danger of unfair prejudice. See Tenn. R. Evid. 404(b) Advisory Comm'n Comments; State v. Parton, 694 S.W.2d 299, 303 (Tenn. 1985); State v. Hooten, 735 S.W.2d 823, 824 (Tenn. Crim. App. 1987).

After a jury-out hearing, the trial court found that Clark's testimony was probative on the issue of the defendant's intent and that intent was an essential element of the crime which the prosecution was required to prove at trial.[13] The court also found that the state had shown by clear and convincing evidence that the incidents described by Clark took place. Although the trial judge did not specifically

---

[13] The state also offered another witness who would have testified to the defendant's prior violations of the Water Quality Control Act of 1977. Tenn. Code Ann. §§ 69-3-101 through 69-3-129 (1987)(as amended in 1989). The trial court excluded this testimony under Rule 404(b) because the evidence was not proof of an intentional violation.

weigh the probative value of the evidence against its potential prejudicial effect in his findings, his earlier comments indicate that he considered the evidence highly probative and, therefore, the probative value outweighed the unfair prejudice. When, as in this case, a trial court substantially complies with the procedural requirements of the rule, its determination will not be overturned absent an abuse of discretion. State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).[14]

On appeal, the defendant contends that the evidence was inadmissible on the issue of intent because (1) his attorney conceded in opening argument that the crime had been committed intentionally, (2) the state admitted that it had no other evidence on the issue of intent, and (3) the probative value was outweighed by the danger of unfair prejudice. These arguments have no merit.

First, the transcript before this court does not contain the opening arguments, and even if the attorney's statement were included, statements of counsel are not evidence. Tenn. R. Crim. P. 29.1; Tenn. R. Evid. 401; State v. Draper, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). At the time of the jury-out hearing, the defense had not yet put on any proof and had not offered to stipulate that the discharge was not an accident or a mistake. Under our law, the state is required to prove every element of the crime charged beyond a reasonable doubt. Although evidence that the defendant committed certain prior acts is admissible only if the ground for relevance is actually being contested, Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980), we find that, on these facts, the element of the defendant's willful intent to violate the law was a material issue in this case.

Moreover, our review of the record does not disclose that the state

_____

[14]    Rule 404 (b) provides that (1) upon request, the court must hold a hearing outside the jury's presence; (2) the court must determine that the evidence is probative on a material issue and must, if requested, state on the record the material issue and the reasons for admitting or excluding the evidence; and (3) the court must exclude the evidence if the danger of unfair prejudice outweighs its probative value.

18

conceded that it was unable to prove willfulness without Clark's testimony. The prosecutor, at one point, merely remarked that Clark's testimony was the only <u>direct</u> proof on the issue. As we discussed above, there was considerable circumstantial evidence that Ross Cunningham was responsible for the illegal discharge. In our view, the fact that the state had little direct proof of intent increases the probative value of the testimony rather than decreases it. See <u>Bunch v. State</u>, 605 S.W.2d at 230. Although the earlier illegal discharges described by Clark did not involve any direct contamination of the sewer system, the evidence was indicative of Cunningham's guilty knowledge and willful behavior. See <u>United States v. Blue Ridge Plating Company, Inc.</u>, No. 92-5441, 1993 WL 358780 (4th Cir. Sept. 14,1993) (N.C. unpublished per curiam disposition) (table case at 7 F. 3d 226).

Even if the trial court had erred in finding that Clark's testimony was admissible on the issue of intent, the defendant's identity was clearly a material issue at trial. Cunningham denied that he was in any way responsible for the contamination. Therefore, it was incumbent upon the state to prove that he was the person who spilled the chromium-contaminated liquid into the sewer system. When identity is the issue, the probative value of the evidence of other crimes depends upon the extent to which it raises an inference that the perpetrator of the prior offenses was the perpetrator of the offense at issue. <u>State v. Bunch</u>, 605 S.W.2d at 230 (quoting <u>United States v. Powell</u>, 587 F.2d 443, 448 (9th Cir. 1978)). An inference of identity arises when the elements of the prior offense and the charged offense are sufficiently distinctive that one can conclude that the person who committed the former also committed the latter. <u>Id</u>. However, it is not required that the other crime be identical in every detail to the offense on trial. <u>Id</u>. at 231. The evidence must support the inference that the defendant, who committed the earlier acts, is the same person who committed the offense on trial. <u>Id</u>.

The elements as well as the details of Cunningham's earlier criminal violations are sufficiently distinctive to support an inference that he is the same

19

person who committed the offense on September 4, 1994. All of the violations occurred at the same location and involved the liquids used in plating metal. In the prior acts, the defendant allowed the contaminated waste water to flow out the door and into a storm drain. On this occasion, the liquid was somehow deposited directly into the sewer system. The defendant was the person in charge of plant operations in both instances and was present when the illegal activity took place. Clark identified the defendant as the person who opened the valves on the tanks and allowed the liquid to flow out the door. Cunningham did not refute the identification. We must conclude that the similarity between the prior violations and the one at bar was sufficiently distinctive to support an inference that the same person committed all of the acts.

The testimony of Billy Clark was highly probative on the issues of intent and identity, and the probative value outweighed the danger of unfair prejudice. The trial court gave instructions both at the conclusion of the testimony and in the formal jury instructions which limited the use of the evidence to the issues of intent, knowledge, and/or absence of accident and specifically disallowed its use to prove the defendant's disposition to commit the crimes on trial. We, therefore, conclude that the trial court did not abuse its discretion in admitting Clark's testimony. The evidence was relevant and properly admitted.

### Impeachment with Extrinsic Evidence

The defendant contends that the trial court erred by permitting the state to introduce evidence derived from an illegal search and that substantial prejudice resulted from the error. The record discloses that the trial court, after a pretrial hearing, suppressed the laboratory analyses of material obtained from two tanks and a toilet bowl in the plant.[15] An analysis of the sludge in the toilet bowl revealed that the sludge contained zinc at 16 parts per million. The plating tank

---

[15] The transcript of the suppression hearing is not part of the record on appeal. Apparently, the search warrant was defective.

sample contained 700 parts per million of zinc.  During the trial, the defendant testified on direct examination that the Electroplating facility performed no zinc plating, that the plant contained no zinc, and that he had never discharged any contaminated liquid into the sewer system.   After the defense rested, the prosecutors moved that the test results be admitted to impeach Cunningham's testimony.  Based on James v. Illinois, 493 U.S. 307,  110 S. Ct. 648 (1990) and Walder v. United States, 347 U.S. 62, 74 S. Ct. 354 (1954), the trial court admitted the analysis of the toilet sludge but excluded the results obtained from the plating liquid in the tanks.  The trial court also refused to admit photographs of the plant and ordered that the state's witnesses not mention that the samples were obtained during a search.  After the testimony was complete, the court instructed the jury that the results could be considered only on the question of the defendant's credibility and not as substantive evidence of guilt.  The jury received a written jury instruction containing the same limitations.

The defense argues on appeal that, although suppressed evidence may be admissible for impeachment purposes, the Tennessee Rules of Criminal Procedure prohibit the introduction of extrinsic evidence other than convictions to prove specific instances of conduct in an attempt to impeach a witness.  Tenn. R. Crim. P. 608(b), 609.   The defendant also contends that the evidence was inadmissible under Rule 607 as it was offered to contradict a collateral fact. The state argues, first, that the defendant waived this complaint because he did not invoke Rules 607 and 608 during the jury-out hearing and, second, that the evidence was properly admitted under Walder.  For the reasons discussed below we find that the test results were properly admitted in this instance to impeach the defendant's direct testimony.

The record reflects that the defendant did not contend that the evidence was inadmissible pursuant to the rules of evidence during the jury-out hearing.  However, in his motion for new trial, he argues at length that the state's

21

rebuttal proof was inadmissible pursuant to Rule 608(b) and because it was relevant only to a collateral fact. Therefore, we consider the issue on its merits. See Tenn. R. App. P. 3(e), 36(a).

First, it is important to point out that, aside from constitutional exclusionary-rule constraints, the presence of zinc in the defendant's plant was otherwise clearly relevant to show substantively that the defendant was responsible for the illegal discharge. The samples taken from manhole 15 and at the Dry Creek treatment plant contained zinc as well as chromium, nickel and other metals. Therefore, but for the constitutional constraints, the fact that the sludge in the plant's unused toilet contained zinc would have been admissible as relevant substantive evidence under Tennessee Rules of Evidence 401 and 402. Moreover, such evidence would not have been excludable under rule 403. The probative value was not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Next, we examine the scope of the "impeachment" exception to the constitutional exclusionary rule. Evidence obtained through illegal means and, for that reason, rendered inadmissible by the exclusionary rule, is nevertheless admissible to impeach the direct testimony of the defendant in a criminal case, Walder v. United States, 347 U.S. 62, 74 S. Ct. 354 (1954), and also to impeach the defendant's "answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination." United States v. Havens, 446 U.S. 620, 627, 100 S. Ct. 1912, 1916 (1980). This constitutionally permissible impeachment is not limited to evidence that merely attacks the quality of a defendant's testimony. Rather, Walder and Havens clearly authorize the use of "impeachment" evidence which is relevant to substantive issues and which usually implicates the defendant on the ultimate issue of guilt. In these cases, illegally-obtained physical evidence used to impeach the defendant-witness would have

22

cogently inculpated the defendant, were it not for the limitations on use. See also Harris v. New York, 401 U.S. 222, 91 S. Ct. 643 (1971) (allowing impeachment through the use of a Miranda-deficient confession). Nevertheless, as a function of the constitutional rule and not any evidentiary rule, such evidence is not to be used in the "government's direct case, or otherwise, as substantive evidence of guilt." Havens, 446 U.S. at 628, 100 S. Ct. at 1917. Thus, under the constitutional rule, "impeachment" does not refer to precisely-crafted rules of evidence so much as it signifies a general policy of not permitting "false testimony [to] go unchallenged." Id., 446 U.S. at 627, 100 S. Ct. at 1917.

In the present case, the defendant complains about the use of rebuttal evidence.[16] However, as we have seen, this evidence was admissible under the rules of evidence as substantive evidence of guilt. It was also admissible from a constitutional standpoint as long as the use was limited to impeaching the defendant's credibility. The trial court not only instructed the jury at the conclusion of the rebuttal testimony that the rebuttal could be considered only on the question of the defendant's credibility and not as substantive evidence of guilt, but it also provided the jury with a written instruction containing these limitations. As such, both evidentiary and constitutional requirements have been met.[17]

---

[16] Rule 608(b) governs the admissibility of specific instances of conduct to attack or support the credibility of a witness. Such proof, if probative of truthfulness or untruthfulness, may be inquired into on cross-examination. Tenn. R. Evid. 608(b). The defendant is correct when he argues that the rule specifically states that extrinsic evidence of specific instances of conduct may not be admitted. Id.

Rule 608, however, is not relevant to these facts. See United States v. Perez-Perez, 72 F.3d 224, 227 (1st Cir. 1995). In this case, the laboratory analyses and the testimony about them is neither opinion testimony nor evidence of a specific act. Rule 608 does not determine the admissibility of evidence introduced to factually contradict a witness's testimony. United States v. Lopez, 979 F.2d 1024, 1033 (5th Cir. 1992)(citations omitted).

[17] In addition to his rule 608 argument (see n.16 supra), the defendant has argued that the rebuttal impeachment was improper because the facts being shown were collateral. Because the defendant has challenged the state's rebuttal as impeachment evidence, we have considered whether the limitation on the use of the constitutionally-infirm evidence requires that the impeachment provisions of the Tennessee Rules of Evidence be satisfied. We see no reason nor basis for imposing such a requirement.

**Double Jeopardy**

The defendant contends that the convictions of Electroplating, Inc.,

and himself personally for the same unlawful discharge of chromium violates double

---

The type of impeachment typically called for in cases when the evidence is physical evidence that was illegally seized, such as in Walden, Havens, and the present case, is impeachment by fact contradiction. In Tennessee, fact contradiction is qualified by the "collateral evidence" rule. Neil P. Cohen, Donald F. Paine, & Sarah Y. Sheppeard, Tennessee Law of Evidence § 607.3 (1995). Although Tennessee's rules of evidence do not mention it specifically, the rule is still a viable part of our evidence law. See State v. Perkinson, 867 S.W.2d 1, 6-7 (Tenn. Crim. App. 1992) (co-defendant's possible exchange of drugs did not tend to prove a material issue); State v. Terry Bowen, No. 01C01-9505-CC-00158 (Tenn. Crim. App., Nashville, Aug. 1, 1996) (on cross-examination, counsel is bound by witness's answer if relevant only to a collateral issue); State v. Keith Mack and Terry D. Clark, No. 02C01-9107-CR-00156 (Tenn. Crim. App., Jackson, Aug. 26, 1992) (no rebuttal testimony on a collateral matter); Cohen, Paine, & Sheppeard, Tennessee Law of Evidence, §§ 607.3 and 613.5.

A collateral fact is one which has no relevance except that it contradicts something said in court. The fact is not collateral "if it is relevant independent of any contradiction." Cohen, Paine, & Sheppeard, Tennessee Law of Evidence, § 607.3. Extrinsic evidence is relevant where it logically impeaches a witness through factual contradiction that reveals lack of opportunity or capacity to observe, bias, or otherwise implicates deficient quality as a witness. Id. The treatise writers do not mention impeachment by extrinsic evidence that factually contradicts the witness on a substantive issue because extrinsic impeachment evidence that is admissible because it is relevant to prove a material issue is generally admissible as substantive evidence under Tennessee Rules of Evidence 401 and 402. In effect the courts have not been called upon to review the impeachment admissibility of extrinsic contradiction evidence based on relevance to a material issue in the case. Put another way, relevant substantive evidence that contradicts a witness's statement is almost always "non-collateral," in the parlance of impeachment evidence. Once a court, in making an evidentiary analysis, finds the evidence admissible substantively under rule 401-403, any inquiry about the collateral nature of the evidence as impeachment by fact contradiction is superfluous.

We are aware that, in Havens, the Supreme Court speaks of the tainted evidence being used for impeachment that is "otherwise proper," Havens, 446 U.S. at 628, 100 S. Ct. at 1917, but we believe that if fact-contradiction on a substantive issue must be pressed into the mold of impeachment evidence in order to satisfy a constitutional constraint, such evidence can be said to be non-collateral for impeachment purposes. This conclusion is supported by an analogy to the use of a prior inconsistent statement as an impeachment device. The prior statement is not collateral if it is relevant either (1) "to impeach some specific testimonial quality" or (2) "to prove or disprove a material proposition." Cohen, Paine, & Sheppeard, Tennessee Law of Evidence § 613.5 (emphasis added); see also State v. Mayo, 735 S.W.2d 811, 817 (Tenn. Crim. App. 1987) (For purposes of using a prior inconsistent statement to impeach a witness, a "collateral fact is one which affords no reasonable inference as to the principal matter in dispute.") By analogy to the collateral evidence rule employed under rule 613, evidence that tends to prove or disprove a material fact in issue would not be collateral evidence in a "theoretical" impeachment by fact contradiction.

24

jeopardy. He argues that because he was the sole shareholder and the president of the corporation, he and the corporation were the same party. Therefore, the two convictions are, in essence, a multiple punishment for a single offense. We disagree.

The Fifth Amendment to the United States Constitution and Article 1, Section 10 of the Tennessee Constitution protect one accused of a crime (1) against a second prosecution after an acquittal; (2) against a second prosecution after conviction; and (3) against multiple punishments for the same offense. State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996). Double jeopardy becomes a factor only when the defendant who faces retrial or multiple punishments for the same crime is the same person in the each instance. The prosecution, conviction, and punishment of two co-defendants for the same criminal act do not violate double jeopardy principles.

In this instance, the corporation, Electroplating, Inc., is not the same person as Ross Cunningham. A corporation is, by definition, a legal entity, an "artificial person" that has the power to act and to reason. State v. Sowder, 826 S.W.2d 924, 926 fn 2 (Tenn. Crim. App. 1991); Tenn. Code Ann. §§ 48-2-102(9), 48-3-501(4), 48-11-201(19) (1995). Moreover, the corporation, as an artificial person, has an identity separate and distinct from its officers and shareholders.[18] Old Hickory Engineering and Machinery Co. v. Henry, 937 S.W.2d 782, 785 (Tenn. 1996). Incorporation creates a new entity that bears responsibilities and liabilities beyond that of any single shareholder. See Tenn. Code Ann. § 48-13-102 (1995). Indeed , the creation of this artificial person whose existence reduces the financial liability of the shareholders is one of the main purposes of incorporation. See Tenn. Code Ann. § 48-16-205. Ross Cunningham accepted the advantages and

_____

[18]     For purposes of the self-incrimination clause, a man who is corporate president, director, and sole shareholder is a separate person from his corporation. See Braswell v. United States, 487 U.S. 99, 99, 108 S. Ct. 2284, 2285 (1988).

protections inherent in this separate and distinct corporate identity. He cannot now argue that he and the corporation are one.[19]

The defendant also argues that a jury would be more inclined to convict the defendant when it learned of additional serious allegations against the corporation. This appears to be more of an argument for severance than one for double jeopardy and is likewise without merit. The jury in this case had no trouble distinguishing between Ross Cunningham and the corporation. Cunningham and the corporation were both charged with discharging chromium into the sewer system on September 5, 1994, and with vandalism to public property. Count two of the indictment charges the corporation with other illegal discharges. The trial court carefully instructed the jury who convicted the corporation on all three counts but acquitted Ross Cunningham of vandalism.

The convictions of both Ross Cunningham and the corporate entity known as Electroplating, Inc., for the same violation of the Water Quality Control Act of 1977 do not violate double jeopardy principles.

**Denial of Judicial Diversion**

In his last issue, Cunningham challenges the trial court's denial of judicial diversion. The Sentencing Reform Act of 1989 provides in pertinent part:

> If any person who has not previously been convicted of a felony or a Class A misdemeanor is found guilty or pleads guilty to . . . a Class C., D, or E felony, the court may, without entering a judgment of guilty and with the consent of such person, defer further proceedings and place the person on probation upon such reasonable conditions as it may require and for a period of time not less than the period of the maximum sentence . . . of

---

[19] As the state notes in its brief, prosecutions against corporations and individuals as co-defendants for the same criminal acts, while rare, are not unknown in Tennessee. See, e.g., State v. Superior Oil, Inc., et al., 875 S.W.2d 658 (Tenn. 1994) (violations of the Water Quality Control Act); State v. Lucy M. Hunt and Guess What, Inc., 660 S.W.2d 513 (Tenn. Crim. App. 1983) (possessing obscene material with the intent to distribute); State v. Shearon Davis and Guess What, Inc., 654 S.W.2d 688 (Tenn. Crim. App. 1983) (unlawful distribution of obscene material).

the felony with which he is charged . . . .

Tenn. Code Ann. § 40-35-313(a)(1) (1997). This procedure, commonly known as judicial diversion, is similar to pretrial diversion; however, judicial diversion follows a determination of guilt and the decision to grant diversion rests with the trial court, not the prosecutor. State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

Tennessee Code Annotated section 40-35-313 does not entitle the accused to the favorable presumption created by Tennessee Code Annotated section 40-35-102(6). The lower court's denial of judicial diversion is subject to reversal on appeal only if that court abused its discretion. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983). When a defendant challenges the denial of judicial diversion, we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); Hammersley, 650 S.W.2d at 356.

In determining whether to grant judicial diversion, the trial court must consider

> (a) the accused's amenability to correction,
>
> (b) the circumstances of the offense,
>
> (c) the accused's criminal record,
>
> (d) the accused's social history,
>
> (e) the accused's physical and mental health,
>
> (f) the deterrence value to the accused as well as others, and
>
> (g) whether judicial diversion will serve the interests of the public as well as the accused.

Parker, 932 S.W.2d at 958; State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993) (citation omitted). Moreover, the record must reflect that the court has weighed all of the factors in reaching its determination. Bonestel, 871 S.W.2d at 168 (citations omitted). The court must explain on the record why the defendant

27

does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others. Id.

In this instance, the trial court did not place on the record an adequate explanation for denying the defendant's request for judicial diversion as required in Bonestel. The trial court did not explain whether it had considered all of the other factors or discuss the weight given to the applicable factors. After determining which enhancement and mitigating factors applied, the trial judge merely said, "I think because of that history I'm not inclined to divert under 40-35-313, but rather set a sentence that will include a substantial amount of public service work and an appropriate fine and a period of probation." We must, therefore, determine whether the trial court reached the correct result notwithstanding its failure to explain its reasoning. See State v. Talmadge G. Wilbanks, No. 02C01-9601-CR-00003 (Tenn. Crim. App., Jackson, Nov. 19, 1996).

A number of factors tend to favor the granting of judicial diversion. Ross Cunningham has lived a productive life. His wife was supportive of him through the resolution of these charges. Many friends and business acquaintances spoke on his behalf at the sentencing hearing. At the time of sentencing, he was 66 years old. He suffers from asthma and other medical problems. After serving in the army from 1949 to 1951, he spent 42 years in the electroplating business. He obtained a patent on a process for removing chromium from the plating solution and installed the system in his plant in 1989.

On the other hand, the record also discloses that the defendant does not accept any responsibility for the discharge of the toxic chemicals and apparently has made some attempt to hide assets. Since his retirement in 1994, he reported that he was living on Social Security benefits of $648.00 per month. He claimed that his only assets were two vehicles that together were worth less than $20,000. At the hearing, he testified that all of the real property and other assets were in his

28

wife's name. He has no business-related retirement plan. He insisted throughout that he had not intentionally discharged any contaminated liquid into the sewer system.

Moreover, the circumstances surrounding the discharge that occurred on September 5 are more egregious than the earlier ones. The plant was closed. Although the defendant testified that he sold the waste liquid for a profit, he presented no proof of the sale. A witness for the state testified that it would have cost Electroplating thousands of dollars to dispose of the material legally. The discharge on September 5 was a deliberate, intentional act. It caused damage to the sewer close to the plant and posed a potential danger to the pumping stations, the water treatment plant, and to the Cumberland River and its ecosystem.

Although the pre-sentence report revealed no prior criminal convictions or arrests, testimony at trial and at the sentencing hearing indicated that on many occasions contaminated liquids ran out the door of the plant and into a storm sewer across the street. The record also indicates that the defendant had been cautioned and fined on several occasions for improperly discharging contaminated liquid into the street. Cunningham freely admitted that inadvertent discharges had occurred but insisted that since 1989 the trench drain and his patented process had prevented further problems. One witness, however, testified that since 1989 he had observed dark blue, turquoise or rusty colored liquids running from the plant twenty or thirty times.

We find that the circumstances of the offense and Cunningham's past disregard of the regulations controlling the disposal of contaminated liquid outweigh his positive social history. Moreover, his unwillingness to accept responsibility and his efforts to disguise his assets reflect unfavorably on his amenability to correction. Judicial diversion, in this instance, would not serve the manifest public interest in maintaining clean water and a healthy environment. On these facts, we cannot

29

conclude that the trial court abused its discretion in denying judicial diversion.

**State's Appeal -- Restitution**

The state contends that the trial court erred in not requiring Ross Cunningham to pay restitution for costs and damages to the sewer system caused by the illegal dumping of contaminated waste water. It is the opinion of this court that the state does not have a right to appeal the issue presented for review. A panel of this court addressed this issue in State v. Kevin Crespo, No. 03C01-9504-CR-00118 (Tenn. Crim. App., Knoxville, Apr. 19, 1997) ( no perm. app. filed), in which the state appealed the amount of restitution imposed by the trial court.[20]

In Crespo, the majority held that based on the language contained in Tennessee Code Annotated section 40-35-402, the legislature had not given the state the right to appeal issues concerning restitution. Kevin Crespo, slip op. at 2. One member of the Crespo panel dissented on this issue. He argued that the broad language in the first sentence of the statute included fines and restitution. Kevin Crespo, separate concurring and dissenting opinion at 2 (Summers, J. concurring and dissenting). However, as the Kevin Crespo majority noted, the statute does not stop with this broad language. See Kevin Crespo, slip op. at 2 n.4. The statute states: "The district attorney general in a criminal case may appeal from the length, range, or manner of the service of the sentence imposed by the sentencing court." Tenn. Code Ann. § 40-35-402(a). However, the statute also limits the right of appeal to the following enumerated grounds:

> (b) An appeal from a sentence is limited to one (1) or more of the following grounds:
>
> (1) The court improperly sentenced the defendant to the wrong sentence range;
>
> (2) The court granted all or part of the sentence on probation;

---

[20] Also at issue was the trial court's decision not to impose a fine although one had been set by the jury. The majority concluded that neither fines nor restitution were appropriate issues for a state appeal. Kevin Crespo, slip op. at 2.

(3) The court ordered all or part of the sentences to run concurrently;

(4) The court improperly found the defendant to be an especially mitigated offender; or

(5) The enhancement and mitigating factors were not weighed properly.

Tenn. Code Ann. § 40-35-402 (b) (1997). Based on the specific language in section 40-35-402(b), we find that the state does not have the right to appeal a trial court's failure to order restitution. Therefore, the state's appeal is dismissed.

Moreover, the record of the sentencing hearing is silent on the subject of restitution. Although the state presented evidence concerning the damage to the sewer system and other costs at trial, the prosecutors did not refer to this evidence at the sentencing hearing and did not ask the court to impose any restitution. Therefore, even if this court had the jurisdiction to consider the issue, it would be waived. Tenn. R. App. P. 36 (a).

## Conclusion

For the reasons discussed above, we affirm Ross Cunningham's conviction for violation of the Water Quality Control Act of 1977 and the sentence imposed by the trial court. The state's appeal is dismissed.

_____
CURWOOD WITT, Judge

CONCUR:

_____
GARY R. WADE, Judge

_____
WILLIAM M. BARKER, Judge

31