IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 16, 2019

## STATE OF TENNESSEE v. RUDOLFO VALENTIN GONZALEZ II

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2018-CR-152  Jill Bartee Ayers, Judge**

_____

### No. M2018-01846-CCA-R3-CD

_____

On August 1, 2018, the Defendant, Rudolfo Valentin Gonzalez II, pleaded guilty to aggravated assault and aggravated burglary.  The trial court sentenced him as a Range I, standard offender to concurrent three-year sentences, and the Defendant was released on supervised probation.  The Defendant argues on appeal that the trial court erred in denying his request for judicial diversion.  After thorough review, we affirm the sentencing decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and NORMA MCGEE OGLE, JJ., joined.

Edward E. Dewerff (at hearing), and Greg Smith (on appeal), Clarksville, Tennessee, for the appellant, Rudolfo Valentin Gonzalez II.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Brett Ligon, District Attorney General; and Robert Nash, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

On February 6, 2018, the Montgomery County Grand jury indicted the Defendant for aggravated assault and aggravated burglary.  According to the record, police responded to the hospital on October 9, 2017, after a domestic aggravated assault was reported.  The victim, Crystal Townsend, informed police that the Defendant had assaulted her at his home.  The victim told police that the Defendant had become angry

and began yelling after she walked away from him at his home. After the victim told the Defendant not to speak to her like that, he "grabbed her by the legs, dragged her off the bed, causing her head to hit the floor hard. He then picked her up by the neck and carried her by the throat into the bathroom and sat her on the vanity." The victim said that the Defendant "squeezed her throat so that she could not breathe" and only released her after she shook her head "no" in response to his question, "[A]re you going to walk away from me again?"

After the Defendant released her, the victim asked him if this was "the way he normally treats women[.]" He "became enraged" and started "punching her in the abdomen and in the back of her head repeatedly." She then told him she hated him and asked to go to the hospital. In response, the Defendant "picked her up by the neck and again" and "began to squeeze and put his weight on her throat." The victim lost consciousness, and after she came to, the Defendant "apologized but refused to take her to the hospital." After the Defendant fell asleep, the victim returned to her home and called a friend to transport her to the hospital, where police took her statement. While the victim was in the hospital, she was also able to show police "feed and security cameras" from her home on her phone, showing the Defendant "in her residence" with "audio of him yelling out looking for her." To get inside the victim's home, he kicked the door in, breaking the door and part of the door jam. After police contacted the Defendant, he "made some admissions" and "admitted to holding [the victim] during the altercation." The Defendant pled guilty to the indicted offenses.

The victim testified at the Defendant's sentencing hearing. She stated that she and the Defendant had been dating for two months at the time of the assault and reiterated what she told police while she was in the hospital. After the assault, the Defendant refused to take the victim to the hospital, and she started throwing up "for about two hours" because she "had a concussion." The victim managed to leave the Defendant's home "around 3:30, 4:00 in the morning" and called her children's father to ask him to come to her house because she thought that the Defendant "was going to come back over there, once he found out I was gone, because he was so mad." Her children's father agreed to take the victim to the hospital because she was "still throwing up" and "couldn't drive there[.]" She also reiterated that her security cameras had footage of the Defendant kicking down her door and entering her home while she was in the hospital. The victim testified that the assault caused her to be "scared of men" and to have nightmares. When asked how she felt about the Defendant potentially receiving judicial diversion, the victim stated that she was "very against it." Though the Defendant apparently claimed that the victim had pointed a gun at him at the time of the assault, she denied such an assertion.

Hache Ferreira, who had served in the military with the Defendant, testified at the sentencing hearing that the Defendant told him he had to defend himself from the victim. Eric Betancourt, who had also served in the military with the Defendant, testified that the Defendant told him he had "choked" and "punched" the victim. He stated he still thought of the Defendant as "a good soldier" and still trusted him.

At the close of the sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to concurrent three-year sentences, and the Defendant was released on supervised probation.

## ANALYSIS

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i)(a)-(e), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; is not seeking deferral for an offense committed by an elected official; is not seeking deferral for a sexual offense; has not been convicted of a felony or a Class A misdemeanor previously and served a sentence of confinement; and has not been granted judicial diversion or pretrial diversion previously. Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)).

The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." Id. Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. When reviewing a trial court's decision to grant or deny judicial diversion, the standard of review is abuse of discretion with a presumption of reasonableness. State v. King, 432 S.W.3d 316, 327 (Tenn. 2014). However, if the trial court failed to weigh and consider the relevant factors, this court may conduct a de novo review or remand the case for reconsideration. Id. at 328.

At the Defendant's sentencing hearing, the trial court made the following considerations regarding the above-mentioned factors:

All right, then we'll first address the issue on judicial diversion. [The Defendant] is eligible for diversion. That Document has been filed and is in the court file.

And so there are seven factors the Court has to consider in weighing whether someone might be a good candidate for diversion.

The first factor is the accused['s] amenability to correction. Normally, in a case like this we don't have a lot of information on that. But as part of the pre-sentence report there is documentation in the file that [the Defendant] did attend a course on domestic assault and that he has taken some action toward correction of his behavior.

The second factor is the one that is, of course, the most concerning to the Court, and that is the circumstances of the offense in this case. The pictures absolutely speak for themselves, that this was a very violent crime, in that [the victim] did suffer[] some significant injuries.

And what I think is two parts under that section that are the most troublesome for the Court in considering diversion, one, is that [the Defendant] entered a no contest plea and still in the pre-sentence report was claiming that a weapon was pointed at him and he had to disarm [the victim].

Well, those photographs of bruises around the neck don't in any form or fashion look like disarming a person. That's just not consistent at all with what he's testifying to.

The other part of it that is disturbing is, you know, if there was a one[-]time incident, that maybe there was a trigger that caused the choking incident, the violence against [the victim], but the fact that after she left he went back to her home, and knocked the door in, and went back for some other reason there. Those two issues are of importance and a particular note in considering the circumstances of the offense.

When you look at the other factors; the accused criminal record, certainly there's nothing there. [The Defendant] has a clean criminal record.

His social history and physical and mental health appear to be for the most part good. Although, it does appear he is a disabled veteran.

- 4 -

And the Court wants to say, certainly that I appreciate his service. I know that job that he does in the military is a difficult job and can cause problems. There's no doubt about that. But we all appreciate that service.

The next factor is the deterrence value to the accused and to others. And that is an issue for the Court to consider and weigh. If diversion is granted, is that a proper deterrent for this type of behavior?

And then the last factor is whether the judicial diversion would serve the interest of the public, as well as the accused?

And, again, these are tough cases when someone has such a clean record and then they have this type of behavior. A lot of times there is just a one incident and that's it.

But in this case, again, the pictures that do pretty well speak volumes, as to the injuries that [the victim] sustained, and then the second act of going back to her home, and then the fact that [the Defendant] by my way of credibility was not truthful about his statement, that he had to disarm [the victim]; in weighing all of those factors I just don't see that he is a candidate for diversion.

And, you know, I don't like that, but that's the Court's opinion in weighing all of these factors, that I don't belie[ve] because of the circumstances of the offense and the fact that the Court finds that he is not truthful that diversion is not – he's just not entitled to diversion.

As evidenced by the above sentencing hearing excerpt, it is obvious that the trial court thoroughly considered all the evidence before it prior to denying the Defendant judicial diversion, and the trial court stated its reasons for doing so. The court explained that although the Defendant was eligible for judicial diversion, the court would not grant him judicial diversion after individually examining each of the above-mentioned factors in light of his offense. The trial court noted that it found especially troubling that the Defendant maintained that the assault happened because he was trying to protect himself from the victim, even though the Defendant entered a no contest plea. The trial court's denial of judicial diversion is entitled to a presumption of correctness absent an abuse of discretion. The record reflects no abuse of discretion, and we accordingly affirm the trial court's sentencing decision. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the sentencing decision of the trial court.

_____
ALAN E. GLENN, JUDGE