IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 27, 2016 Session

**STATE OF TENNESSEE v. WENDI HOPE TUNNY**

**Appeal from the Circuit Court for Sevier County**
**No. 18537-II    Richard R. Vance, Judge**

_____

**No. E2014-02502-CCA-R3-CD – Filed June 1, 2016**

_____

The Defendant, Wendi Hope Tunny, appeals as of right from the Sevier County Circuit Court's denial of her request for judicial diversion and order that she serve her five-year sentence in split confinement following her guilty-pleaded conviction for theft of property valued at $10,000 or more but less than $60,000, a Class C felony. See Tenn. Code Ann. § 39-14-103; -13-105(a)(4). On appeal, the Defendant contends that the trial court erred by failing to consider all of the applicable factors for judicial diversion and by failing to conduct a proper weighing of those factors. Following our review, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Andrew E. Farmer, Sevierville, Tennessee, for the appellant, Wendi Hope Tunny.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley (at oral argument); and Ahmed A. Safeeullah (on brief), Assistant Attorneys General; James B. (Jimmy) Dunn, District Attorney General; and George C. Ioannides, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND

On May 13, 2013, a Sevier County grand jury returned an indictment charging the Defendant with theft of property valued at $60,000 or more but less than $250,000. Subsequently, the Defendant entered into an open plea agreement with the State whereby she agreed to plead guilty to theft of property valued at $10,000 or more but less than

$60,000 and to be sentenced at the discretion of the trial court. At the guilty plea submission hearing on July 15, 2014, the State offered the following factual account in support of the plea:

> [The] [D]efendant had a business relationship with the victims[, Frank and Lynn Barton,] through their company. There was also a personal relationship between her and Mr. Barton. After that relationship was discovered, she continued to have a business relationship with the victims . . . . That personal relationship ended sometime in July or August of 2011. Subsequently, according to [the victims'] testimony, she continued to use the financial resources of the business as well as credit cards and other items . . . . In the course of that time period over the next two years, she took what they would say was over - - well, [$80,362.81] from the business and from them. It was through the use of checks and other items . . . as I've already mentioned, and that all happened - - it was centered here in Sevier County. She used the information other places as well but that is the total . . . .

The trial court held a sentencing hearing on November 12, 2014.[1] Ms. Barton testified that beginning in January 2009, the Defendant worked as a manager at two businesses, Bear Run Falls and Tortoise Management, which were owned by her, her husband, and several family trusts. She described Bear Run Falls as an "overnight rental business" and explained that Tortoise Management was "the owner of about twenty units in a registration building located at Golfview Resort." The Defendant's job duties included managing long-term rental units and serving as property manager for the homeowners association at Golfview. Additionally, she was responsible for handling money "coming in and mak[ing] purchases on behalf of the businesses[.]" In this capacity, she had access to the business checking accounts and company credit cards for Lowe's and Staples, which she was authorized to use for business purposes.

Ms. Barton said that in January 2011, she was informed "from an anonymous person" that the Defendant and Mr. Barton were having an affair. She first noticed irregularities in the business accounts in January 2013. Through an investigation of the accounts from July 2011 to January 2013, she discovered unauthorized spending by the Defendant in the form of checks that she cashed to herself or made out to unauthorized

---

[1] Our recounting of the sentencing hearing is limited to the testimony relevant to the issues presented. The bulk of the evidence presented at the hearing focused on the details of the offense and the disagreement between the parties as to how much money the Defendant stole and whether she actually had permission to spend some of the money. This evidence was largely irrelevant given the fact that the Defendant had already pled guilty to the offense.

recipients, non-business related credit card charges, and shortages in the amount of rents collected. According to Ms. Barton, the unauthorized transactions occurred after the affair between Mr. Barton and the Defendant had ended.

Ms. Barton said that, because of the Defendant's theft, they had to close their overnight rental business. She said that they had not received any reimbursement for the money taken by the Defendant.

The Defendant testified that she had a relationship with Mr. Barton lasting from 2008 until the end of 2011. She described it as "more than just a casual relationship," saying they had "a very consistent and personal relationship." According to the Defendant, she let this relationship "get in the way of making better recordkeeping and things in [their] business relationship." She claimed that Mr. Barton came to the office every two to three weeks and "s[a]t down with the accountant who did the books." She said that itemized statements came in every month, and Mr. Barton spent several days going through them. The Defendant said that "[n]ever once did [Mr. Barton] come to [her] and say, you know, . . . don't do that." The Defendant said that "[i]t got to a point after a four-year relationship that a lot of things just kind of came [sic] understood as far as purchases and things that were being done . . . ."

The Defendant expressed regret that she had been negligent in recordkeeping, but she asserted that Mr. Barton knew about and approved of her spending. She said that Mr. Barton came to her office, went through itemized bills, asked her what the charges were for, and then instructed the accountant to pay them. She claimed that she was "not trying to make excuses for [her actions] but [that] there [was] more to this than . . . Ms. Barton [knew]." She asserted that Ms. Barton was not involved in the businesses, never visited the property in a business capacity, and never looked at the books or asked about anything. The Defendant minimized her actions, saying that she made the wrong assumption that, after the affair ended, she could continue spending money in the way that she did during her relationship with Mr. Barton. The Defendant opined that she was "the recipient of some revenge . . . ."

When asked on cross-examination what, specifically, she did steal, the Defendant responded that she had "always" had Mr. Barton's permission to spend money since 2008, when the affair began. She said that because of the "casual relationship," and Mr. Barton's expressed desire to ensure that "anything that [she] need[ed]" should be taken care of, there might have been some things she did not get his express permission for, but that it was "not [$80,000] worth." When asked again what she stole from the Bartons, she answered, "I didn't steal."

Upon questioning from the court, the Defendant testified that she had a high school education and two years of college. She said that before she began working for

the Bartons, she had worked for "a couple of years" at a real estate company and had obtained her "real estate license and business management" through the Tennessee Real Estate Commission.

Mr. Barton was called by the State as a rebuttal witness. He testified that his relationship with the Defendant ended in August 2011 and that he did not give her permission to spend any of the money she was accused of stealing. He admitted that he reviewed financial statements prepared by the accountant, but he said that he stopped that practice in August 2011 when his relationship with the Defendant ended.

Mr. Barton said that the Defendant's theft had resulted in the closing of Bear Run Falls and that Tortoise Management still owned the overnight rental company, but that it was managed by a third party.

Mr. Barton explained that the Defendant remained in their employ even after the affair was discovered because he "still trusted her to take care of [his] business" at that point. He admitted that retaining her was a mistake but that he "had no idea that she would take this amount of money during that period of time." He said that when he discovered the theft, he felt "violated."

Before imposing a sentence, the court stated that it had "considered the pre-sentence investigation report,[2] the facts of the offense, the testimony of the witnesses, the exhibits, statements and arguments of counsel, the principles of sentencing under [the] Sentencing Reform Act, and the entire record in this cause."

In considering whether to grant judicial diversion, the court noted the following:

> The [c]ourt has considered all the circumstances of this offense, which consists of not one theft, but multiple thefts over an extended period of time, her lack of remorse, whether or not she would be amenable to correction, her lack of criminal record, her apparently good mental and physical health, the deterrent effect upon the [D]efendant and others, and whether the interest of the public as well as the [D]efendant should be best served by placing her on judicial [diversion]. This was basically an embezzlement case. . . . She abused her position of trust. She issued checks in others' names which she herself cashed. She used credit cards for her own purposes. Again, she related that she believed it was all right because Mr. Barton and she had [an] understanding. The [c]ourt finds

---

[2] The presentence investigation report is sparse and contained a note that the Defendant "did not contact with officer for an interview, nor was a personal history questionnaire submitted."

otherwise. These thefts occurred after the affair ended. Mr. Barton no longer even came to the site, and certainly [the Defendant] had no reason to believe that she had the authority to make expenses [sic] which were not business-related expenses, legitimate business expenses. Allowing her to avoid having the conviction on her record would put future employers at risk. The losses were significant. So for all these reasons, the [c]ourt denies her petition for judicial diversion.

Ultimately, the court sentenced the Defendant as Range I, standard offender to five years, with six months to be served in the county jail and the balance on supervised probation. It is from this decision that the Defendant now appeals.

## ANALYSIS

On appeal, the Defendant contends that the trial court erred because it failed to consider one of the applicable factors when determining whether to grant judicial diversion, namely, her social history. The Defendant further contends that the trial court erred by failing to properly weigh the applicable factors. The State disagrees, responding that the trial court properly considered and weighed the relevant factors before denying the Defendant's request for judicial diversion.

There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). The decision to grant judicial diversion lies within the sound discretion of the trial court. State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). When the trial court has placed "on the record its reasons for granting or denying judicial diversion," the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion. State v. King, 432 S.W.3d 316, 327 (Tenn. 2014). We may not revisit the issue so long as the record contains any substantial evidence to support the trial court's action. Parker, 932 S.W.2d at 958.

When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's mental and physical health; (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing Parker, 932 S.W.2d at 958); see also King, 432 S.W.3d at 326 (reaffirming that the Electroplating requirements "are essential considerations for judicial diversion").

A trial court is "not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness." King, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it." Id. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." Id. "In those instances, the appellate courts may either conduct a de novo review or . . . remand the issue for reconsideration." Id. at 328.

The Defendant first asserts that the trial court failed to consider her social history when considering whether to grant judicial diversion. Initially, we note that the Defendant did not participate in the preparation of the presentence report, and she did not present any evidence of her social history at the sentencing hearing. During argument at the sentencing hearing, counsel characterized the Defendant's failure to cooperate in the presentence investigation as "unintentional," alleging that the Defendant had not been contacted by the probation office. Regardless, a defendant bears the burden of proving her suitability for judicial diversion. See State v. Faith Renea Irwin, No. E2007-01990-CCA-R3-CD, 2009 WL 1034770, at *4 (Tenn. Crim. App. Apr. 17, 2009) (citing State v. Curry, 988 S.W.2d 153, 157 (Tenn. 1999); State v. Baxter, 868 S.W.2d 679, 681 (Tenn. Crim. App. 1993)). Here, the only testimony regarding the Defendant's social history was brief and was in response to a direct question from the trial court. Obviously, where a defendant fails to provide the court with relevant information regarding one of the factors, such factor will not weigh heavily in its decision regarding the grant or denial of judicial diversion. Further, the trial court's failure to specifically recite the social history factor does not result in a loss of the presumption of reasonableness. See King, 432 S.W.3d at 327. In our view, the fact that the trial court directly asked about the Defendant's educational and vocational background is sufficient to show that it considered that factor when making its decision.

Next, the Defendant contends that the trial court did not "explain on the record why it considered the factors that it did" and did not "weigh the . . . factors against each other." Before denying diversion, the court stated the factors it found applicable to the instant case, including the circumstances of the offense, her amenability to correction, her lack of criminal record, her good mental and physical health, the deterrent effect to the Defendant and others, and whether the interest of the public would be served. The court then focused on the circumstances of the offense, especially the fact that the Defendant abused a position of trust and engaged in a sustained pattern of criminal behavior, leading to "significant" losses to the victims. The court also noted that granting diversion would put future employers at risk.

-6-

Although the trial court did not utilize any "magic words" in its analysis, see King, 432 S.W.3d at 327 n.8., the record supports a finding that the court enumerated the factors that were relevant, weighed them, and discussed those that it considered most substantial. The Defendant asserts in her brief that the trial court failed to consider the "positive factors" that made her a good candidate for diversion, such as "her lack of criminal record, good social and employment history, likelihood of being sufficiently deterred by a probationary sentence, and good physical and mental health." However, the trial court specifically recognized her lack of criminal record and "apparently" good physical and mental health. Additionally, as discussed above, the Defendant failed to present significant evidence of her social history. With respect to deterring future criminal behavior, we note that the trial court noted her "lack of remorse" and discredited her sentencing hearing testimony, both determinations that are germane to assessing a defendant's rehabilitation potential. See State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) (noting that "[i]t is unrealistic to assume that someone who has just pled guilty to a felony conviction[,] . . . denies any criminal wrongdoing for the offense for which they have just pled, and is in general unrepentant is someone who could immediately return to their community and be expected to assume a role as a functioning, productive and responsible member of society").

Having determined that the trial court properly identified and weighed the Parker and Electroplating factors, we afford the court's decision to deny judicial diversion a presumption of reasonableness and assess whether there was any substantial evidence in the record to support that decision. See King, 432 S.W.3d at 327; Parker, 932 S.W.2d at 958. The Defendant cites to State v. Jared Booth Spang, No. M2014-00468-CCA-R3-CD, 2015 WL 510921 (Tenn. Crim. App. Feb. 6, 2015), in support of her argument that the trial court abused its discretion when denying diversion. However, contrary to the analysis in her brief, the Spang court did not hold "that it was an abuse of discretion to deny the [d]efendant [diversion] based on a single factor." Rather, in Spang, a panel of this court noted that the trial court erred in considering "the permanence of death in a reckless homicide case" but ultimately concluded that the trial court otherwise considered the appropriate factors and that its decision to deny diversion was not an abuse of discretion. Id. at *4. Consequently, we fail to see how Spang supports the Defendant's contention that the trial court in the instant case "committed the same error" as the trial court in Spang.

Our own review of the record leads us to conclude that there was substantial evidence supporting the trial court's decision to deny judicial diversion. Rather than using the sentencing hearing as an opportunity to convince the trial court of her suitability for judicial diversion, the Defendant minimized her responsibility for the theft and characterized herself as a victim of "revenge." The trial court appropriately considered the applicable factors, noting her lack of remorse and placing particular weight on the

-7-

circumstances of the offense, including her abuse of trust and sustained criminal intent. We have previously held that "[t]he denial of judicial diversion may be based solely on the nature and circumstances of the offense, so long as all of the other relevant factors have been considered, and this fact outweighs all others that might favorably reflect on the [d]efendant's eligibility." State v. George William King, No. M2001-02026-CCA-R3-CD, 2002 WL 31520648, at *4 (Tenn. Crim. App. Nov. 13, 2002) (citing Curry, 988 S.W.2d at 158). Accordingly, the Defendant is not entitled to relief.

## CONCLUSION

Based upon the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE