IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 20, 2016 Session

## STATE OF TENNESSEE v. ROSA EMMA HONEYCUTT

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S62817      James F. Goodwin, Judge**

---

**No. E2015-00790-CCA-R3-CD - Filed September 29, 2016**

---

A Sullivan County Criminal Court Jury convicted the appellant, Rosa Emma Honeycutt, of failing to report suspected child sexual abuse, a Class A misdemeanor, and the trial court sentenced her to eleven months, twenty-nine days to be served on unsupervised probation. On appeal, the appellant contends that the trial court erred by denying her request for judicial diversion. Based upon the oral arguments, the record, and the parties' briefs, we reverse the judgment of the trial court and grant judicial diversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Reversed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which, ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Nathaniel H. Evans (on appeal), Knoxville, Tennessee, and Don Spurrell (at trial), Johnson City, Tennessee, for the appellant, Rosa Emma Honeycutt.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Barry Staubus, District Attorney General; and William Harper and Julie Canter, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In October 2013, the Sullivan County Grand Jury indicted the appellant for failing to report suspected child sexual abuse. At trial, the proof established that the appellant was the Superintendent of Tri-State Baptist Children's Home (hereinafter "the Home") in Bristol. On May 30, 2013, Robert Steuart, a child abuse investigator with the Department

of Children's Services (DCS), received a referral concerning the alleged sexual abuse of two boys, JC1 and JC2, at the Home.[1]  Steuart and Detective Tracy Haraz of the Sullivan County Sheriff's Department began investigating the allegations.  The boys, who were brothers, claimed that they had been "tied up" and anally raped repeatedly by CR, a fourteen-year-old boy who also resided at the Home.  Steuart and Detective Haraz questioned CR.  Detective Haraz testified that CR did not admit to anally penetrating JC1 and JC2 but "admitted to having sex" with them and that CR was charged in juvenile court with the delinquent act of rape of a child.

JC1 and JC2, who were in the first and second grade, respectively, at the time of trial, testified that they told the appellant about the abuse and that she spanked them.  They denied telling anyone that CR had a knife.  Darrin Carpenter, who was nineteen years old at the time of trial, testified that he lived at the Home in 2013.  One night, he saw a fully-clothed CR in bed with JC1, "punched" CR, and told the appellant about the incident.  Stephanie Jackson, who was a houseparent at the Home in 2013, testified that on the night in question, Carpenter told her that CR had been in the brothers' room and that he had hit CR.  The following evening, Jackson questioned JC1, and he told her that CR had been "humping" him over a blanket.  The next morning, Jackson told the appellant about her conversation with JC1 and that CR "needed help."  Jackson said she had been trained at the Home to report sexual abuse to the appellant.

Michael Nixon, the Director of the Home, testified for the appellant that he questioned CR about the incident but "never did get anything from him."  Nixon said he was told that CR "was on top of the covers, had clothes on, nobody was indecent, nothing like that."  Nixon was never told of "humping," and he and the appellant "never believed anything happened."  Several other employees, including a male houseparent for all three boys, testified that they never saw any signs that CR had sexually abused JC1 or JC2.

The appellant, who was seventy-one years old at the time of trial, testified that she had been associated with the Home for more than fifty-three years.  During that time, she had worked with over 1,000 children and had suspected and reported child abuse twice.  Neither incident related to this case.  The appellant said that CR came to the facility about one year before JC1 and JC2 and that CR had a "feet fetish."  CR did not come to the Home with any prior allegations of having sexually abused children.  CR was seeing a therapist while he lived at the Home and was required to write down "what was on his mind" as part of his therapy.  In his writings, CR fantasized about rubbing people's feet.  The appellant never saw CR act out against other children, and she developed a good relationship with him.

---

[1] It is the policies of this court to refer to the victims of sexual assault and minors by their initials.  Also, because both boys have the same initials, we will refer to them as "JC1" and "JC2" for clarity.  We mean no disrespect to these individuals.

The appellant testified that she was "buddies" with JC1 and JC2 and that she "loved them dearly." The appellant "may have had to paddle them a time or two," but she tried to treat them like they were her grandchildren. JC1 and JC2 played with CR, and the appellant never saw anything between them that caused her to suspect the brothers were withdrawing from CR. She said that JC1 and JC2 always came to her when they had a problem and that they never reported sexual abuse by CR.

The appellant testified that Darrin Carpenter told her that CR had been in the brothers' room but did not tell her that anything sexual happened. The appellant spoke with JC1 and JC2 separately, and "they said nothing happened." The appellant talked with CR, and he also said nothing happened. The appellant believed CR had been in the room but did not think he had done anything inappropriate to JC1 or JC2. She said that "big boys" were not allowed in the rooms of younger children, and she acknowledged that CR violated the Home's rules by going into the brothers' room.

On cross-examination, the appellant testified that she caught CR in JC1's and JC2's room twice and that she took a pocketknife from him. She also acknowledged that CR's writings "talked about rubbing the children's feet on his wiener." However, she stated that CR's writings were "fantasy" and that she did not consider children "humping" with their clothes on to be sexual abuse. She maintained that she did not think anything inappropriate happened between CR and JC1 or JC2, said that "DCS" and Detective Haraz questioned CR alone and with his parents for about four hours, and said that CR "would [have said] anything when they got through with him." The jury convicted the appellant as charged.

At the sentencing hearing, the appellant requested that the trial court grant her judicial diversion and submitted into evidence more than forty letters written on her behalf by friends, family members, co-workers, and adults who had resided at the Home as children. The State did not present any witnesses but introduced the appellant's presentence report into evidence. According to the January 2015 report, the appellant was a high-school graduate, had two children, and was divorced. In the report, the appellant described her mental health as good but said she suffered from the following physical ailments: severe osteoarthritis, diabetes with neuropathy, hypertension, spinal stenosis, hyperlipidemia, and peripheral vascular disease. The appellant had breast cancer in 1994 and kidney cancer in 2010. The appellant stated in the report that she took various prescription medications but that she had never consumed alcohol, illegal drugs, or non-prescribed drugs. The report showed that the appellant was retired and had no criminal history.

Joseph Alvarado testified for the appellant that he was the uncle of JC1 and JC2 and had custody of their sister, who was almost fifteen years old at the time of the sentencing hearing. In 1995, Alvarado began working at the Home. He said that he knew the appellant and that she was kind and caring to every child "that come through there." When JC1's and JC2's mother was incarcerated, Alvarado took them to live at the Home. He visited them, and they seemed happy. He explained, "[T]hey would hug my neck. They would hug the workers. They would hug Rosa Emma and I think Rosa Emma favored them more than the rest of them really because she would take care of them." At some point, a boy at the Home told Alvarado, who did volunteer work there, that CR had been in the brothers' room. Alvarado spoke with CR, and CR claimed he had been "sitting on the bed talking to them." Alvarado never suspected anything inappropriate, JC1 and JC2 never mentioned the incident to him, and he never noticed the brothers avoiding CR. On cross-examination, Alvarado testified that he did not contact the police because "[t]here was no reason to."

Craig Honeycutt, the appellant's son, testified that his children attended school with JC1 and JC2 and that his wife worked at the Home while the brothers lived there. He said that his daughter played with them "constantly" and that neither his wife nor his daughter reported anything suspicious. Honeycutt identified photographs of JC1 and JC2 sitting on the appellant's lap, kissing her, and smiling with her. He also identified photographs of them at his fortieth birthday party, at vacation Bible school, coloring Easter eggs, and graduating from kindergarten. He said that he never saw JC1 or JC2 exhibit stress or anxiety and that the appellant had no reason to protect CR. He acknowledged that this case had been devastating to the appellant, that DCS no longer allowed her to work with children, and that "[i]t makes you want to second-guess what God has called you to do."

At the conclusion of the hearing, the State argued that the trial court should deny the appellant's request for judicial diversion based upon the circumstances of the offense because the appellant "was [the] one person at that Children's Home that ran the show," knew about CR's "problems," received reports about the abuse, and "ignored it." The State also argued that the appellant was still in denial about what happened and that the deterrence value to the appellant was "extremely high."

The trial court noted that the appellant was seventy-one years old with a criminal history of "zero. . . . [N]ot even a speeding ticket." Thus, the court found that her criminal history favored granting judicial diversion. The trial court stated that her amenability to correction also was "on the positive side" and that her social history was "very good" in that "[s]he has spent a lifetime working with children in very difficult situations" and had many people to support her. The court found that her physical and mental health were "good" and weighed in favor of granting diversion.

Next, the trial court addressed the circumstances of the offense, stating as follows:

> [The appellant] did place her judgment over what the law says she has to do and I believe the legislature has enacted this law because too many times people in a position of authority don't report. They do conduct their own investigation and by doing so place children in harm. [Defense counsel asks] the Court to draw on the Court's experience and part of this Court's experience is that of a child abuse prosecutor for six years and I've seen the results of a person in authority when they don't make that referral.

The trial court found that the circumstances of the offense were "neutral, slightly negative." The court went on to address the deterrence value to the appellant and others, stating that "I've seen what happens." The court found that while the deterrence value to the appellant was "probably not that high" due to her age and the fact that she was no longer in a position of authority at the Home, the deterrence value to others was "extremely high." The trial court also stated that "as much as it pains this Court, . . . judicial diversion would not serve the interest of the public as well as [the appellant]." The court ordered that the appellant serve her sentence of eleven months, twenty-nine days on unsupervised probation and denied her request for judicial diversion.

## II. Analysis

The appellant contends that the trial court denied judicial diversion based solely on the deterrence factor and improperly relied on its prior professional experiences as a prosecutor of child sex crimes to conclude that the factor weighed against diversion. The appellant also contends that no evidence supports the court's deterrence rationale, that the court should have addressed the five deterrence factors discussed in State v. Hooper, 29 S.W.3d 1 (Tenn. 2000), and that she is "the perfect candidate for diversion." The State argues that the trial court did not abuse its discretion. Upon de novo review, we conclude that the trial court erred by denying the appellant's request for judicial diversion.

Our Code provides that any person who "knows or has reasonable cause to suspect that a child has been sexually abused . . . shall report such information . . . relative to the sexual abuse of children, regardless of whether such person knows or believes that the child has sustained any apparent injury as a result of such abuse." Tenn. Code Ann. § 37-1-403(a)(3). Moreover, "[a]ny person required to report known or suspected child sexual abuse who knowingly and willfully fails to do so, or who knowingly and willfully

- 5 -

prevents another person from doing so, commits a Class A misdemeanor." Tenn. Code Ann. § 37-1-165(a).

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; has not previously been convicted of a felony or a Class A misdemeanor; and is not seeking deferral for a sexual offense. Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)). The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision." Id. Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id. When reviewing a trial court's decision to grant or deny judicial diversion, the standard of review is abuse of discretion with a presumption of reasonableness. State v. King, 432 S.W.3d 316, 327 (Tenn. 2014). This means that we "must . . . uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." Id.

Turning to the instant case, the record demonstrates that the trial court considered the seven factors set forth in Parker and Electroplating. However, the court's comments demonstrate that in thinking about the circumstances of the offense and the deterrence value to the appellant and others, the court considered its experiences as a prosecutor of child sex crimes. A trial court must only consider "evidence in the record of the trial, the sentencing hearing, the presentence report and the record of prior felony convictions filed by the district attorney general with the court." Tenn. Code Ann. § 40-35-210(f). Accordingly, the standard of abuse of discretion with a presumption of reasonableness does not apply, and we may conduct a de novo review or remand the issue for reconsideration. See King, 432 S.W.3d at 327-28. We believe that the record is sufficient for de novo review and will address whether the denial of judicial diversion was appropriate in this case.

The parties do not dispute that the appellant qualifies as a candidate for judicial diversion. Therefore, we turn to the Parker and Electroplating factors. First, the appellant lost her ability to work with children; was "devastated" by this case; and

committed no additional offenses. In the presentence report, she stated that she respected the jury's decision, that she was remorseful, and that she would be "extra cautious" in the future. Thus, her amenability to correction weighs in favor of granting judicial diversion. Because she has no prior convictions of any kind, her lack of a criminal record also weighs in favor of diversion. The appellant is a high school graduate and has the support of her family, friends, co-workers, and former residents of the Home. Furthermore, prior to this case, she had worked with more than 1,000 children over a period of fifty-three years. She has never consumed alcohol, illegal drugs, or non-prescription medication and is in good mental health. Although she has several physical ailments, she is seventy-one years old and has survived cancer twice. Moreover, the appellant stated in the presentence report that she was prescribed Lortab in 2010 for back pain and that she proactively enrolled in a pain management program because she did not want to become dependent on hydrocodone. Therefore, we believe that her social history and that the status of her physical and mental health also weigh in favor of diversion.

As to the circumstances of the offense, the evidence at trial focused primarily on the single incident in JC1's and JC2's bedroom and the appellant's failure to recognize from the incident that CR was sexually abusing JC1 and JC2. However, Darrin Carpenter, the only eyewitness to testify about the incident at trial, simply stated that he saw a fully-clothed CR in bed with JC1. Stephanie Jackson testified that JC1 claimed CR was "humping" him over a blanket. Employees of the Home testified that the three boys interacted with each other regularly and that they never saw any signs CR was abusing JC1 and JC2. Contrary to the State's claim at the judicial diversion hearing, the appellant did not ignore the allegations. She spoke with JC1, JC2, CR, and others about the incident and concluded that CR had not sexually abused JC1. Thus, we disagree with the trial court's assessment that the circumstances of the offense weigh against granting judicial diversion.

In considering the deterrence value to the defendant and others and whether judicial diversion will serve the interest of the public as well as the defendant, we note that the trial court contemplated that the appellant "did place her judgment over what the law says she has to do and I believe the legislature has enacted this law because too many times people in a position of authority don't report. They do conduct their own investigation and by doing so place children in harm." While we can appreciate the trial court's concern, the offense requires that a person have "reasonable cause to suspect" child sexual abuse, which may justify a person's own investigation prior to deciding whether to report. Just as a decision not to report can harm a child, a decision to report can have devastating effects on the falsely-accused. In this case, the evidence shows that the appellant had reported abuse previously, that she cared for all three of the children, that she investigated the incident, and that she honestly believed CR did not sexually abuse JC1 or JC2. Nothing indicates that she failed to report the allegations in order to

protect CR or the Home.  Thus, in consideration of the deterrence value to the defendant and others and whether judicial diversion will serve the interest of the public as well as the defendant, we cannot say that they weigh in favor of denying diversion.  Accordingly, we conclude that the trial court erred by denying judicial diversion and grant the appellant's request.

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we reverse he judgment of the trial court and grant judicial diversion.

_____
NORMA MCGEE OGLE, JUDGE