IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 29, 2020 Session

## STATE OF TENNESSEE v. JORDANA JENYANE WRIGHT

**Appeal from the Circuit Court for Anderson County**
**No. B7C00313      Donald R. Elledge, Judge**

_____

### No. E2019-01599-CCA-R3-CD

_____

The Defendant, Jordana Jenyane Wright, pled guilty to Class E felony theft of property with an agreed-upon sentence of one year and six months of probation. Following a hearing, the trial court denied the Defendant's request for diversion. The Defendant appeals, arguing that the trial court, in its decision to deny diversion, failed to properly account for the Defendant's lack of a criminal record and improperly weighed irrelevant facts, such as the Defendant's failure to implicate any potential co-defendants and the criminal history of the Defendant's fiancé. After our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Patrick S. Rader, Assistant Public Defender, District Public Defenders Conference (on appeal); and Ann D. Coria, District Public Defender (at hearing), for the appellant, Jordana Jenyane Wright.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; David S. Clark, District Attorney General; and Emily F. Abbott, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
FACTUAL BACKGROUND

On March 13, 2018, the Anderson County Grand Jury indicted the Defendant for theft of property, that being assorted jewelry belonging to Ms. Christine Schabot ("the victim"), valued at more than $1,000.00 but less than $2,500.00, a Class E felony. See Tenn. Code Ann. §§ 39-14-103, -105. The Defendant pled guilty as charged on March 29,

2019. In exchange for her plea, the Defendant received a sentence of one year and six months to be suspended to supervised probation; she was ordered to pay court costs, as well as to pay restitution in the amount of $1,585.00 to U.S. Standard Gold Buyers, the pawn shop where she had sold the victim's jewelry[1]; she was ordered to have no contact with the victim, the pawn shop, or the nursing home where she had worked cleaning for the victim; and she was prohibited from working in a nursing home or retirement facility while on probation. The issues of diversion and whether the Defendant would be placed on the Elderly and Vulnerable Adult Abuse Registry ("the Registry") were left for the trial court's determination.

The factual basis articulated by the State at the guilty plea hearing indicated that on June 20, 2016, the Defendant pawned the victim's jewelry to U.S. Standard Gold Buyers, a pawn shop in Oak Ridge, for $1,585.00. The State averred that Oak Ridge Police Department Officer Marvelle Moore would testify that the victim, a resident of Greenfield Senior Living Center ("Greenfield"), discovered that her jewelry, "some earrings and a gold brooch with a cross," was missing from her jewelry box on July 5, 2016. When Officer Moore subsequently checked the online database for pawn shops, he was able to determine that that jewelry had been pawned by the Defendant in the June 20, 2016 transaction. The State noted that the Defendant admitted to pawning the jewelry but not that the jewelry was stolen. The Defendant agreed that these were "the true facts of this charge" and that she was pleading guilty because she was in fact guilty. The trial court accepted the Defendant's plea.

The State filed a sentencing memorandum opposing the Defendant's request for diversion. Relative to the factors to be considered for judicial diversion, the State cited the Defendant's "lack of honesty and candor leading up to the charging in this case" as justifying the denial of diversion. The State also averred that the "Defendant's story that a co-worker simply gave her very valuable jewelry as a gift [was] not credible"; that the "Defendant abused her position of trust to perpetrate a crime on a vulnerable victim," especially "considering her employment at a facility that house[d] vulnerable and elderly adults"; and that the Defendant continued to fail to take responsibility for "an active role in depriving the victim of her sentimental property." The State surmised that the circumstances of the offense, the deterrence value to the Defendant and others, and whether judicial diversion would serve the interests of the public all weighed against the granting of judicial diversion to the Defendant. In addition, the State submitted that the Defendant

---

[1] The original September 3, 2019 judgment form listed U.S. Standard Gold Buyers as the party owed restitution, as outlined in accordance with the plea agreement. Although the record does not indicate why, a corrected judgment was filed on December 2, 2019, ordering the Defendant to pay restitution to the victim in place of U.S. Standard Gold Buyers.

should be placed on the Registry pursuant to the considerations listed in Tennessee Code Annotated section 68-11-1003(b).

The Defendant likewise filed a sentencing memorandum, asserting that the factors supported granting judicial diversion. Specifically, the Defendant averred that her conduct neither caused nor threatened serious bodily injury, that she was "extremely remorseful regarding her conduct," that she had no criminal record prior to this offense and that she had committed no new offenses since being released on bond, that she had regained employment and had "shown a work ethic that would allow her to pay restitution," that she was "at low risk of re-offense as recognized by her presentence investigation," and that she was amenable to mental health treatment if recommended. Relative to the State's assertion that the Defendant had attempted to minimize her responsibility for the offense, the Defendant noted that she had admitted that she pawned the victim's jewelry, and she recognized "that she should have questioned where it came from, and should not have accepted it, nor pawned it." In addition, the Defendant asked that she not be placed on the Registry.

A sentencing hearing was held on July 31, 2019. Upon inquiry from defense counsel about the location of the victim's missing jewelry and whether the items would be returned to the victim, the State indicated that "there [was] a law enforcement hold on items at the U.S. Standard Gold Buyers."

The State called Officer Moore to testify. Officer Moore indicated that the police had been informed some jewelry had been stolen from the victim's room and had been provided a list of names from the director of Greenfield, where the victim lived. When the list was cross-referenced with an online database for pawn shops, the Defendant's name was returned as a match, showing that the Defendant had sold some items to U.S. Gold Buyers on June 20, 2016. Officer Moore said that he contacted the pawn shop and was able to obtain pictures of the pawned items. Officer Moore indicated that he took the pictures to Greenfield and showed them to the victim, who identified the items as belonging to her. According to Officer Moore, the victim began to weep because the items were of sentimental value, having been purchased for the victim by her late husband.

Officer Moore testified that he, accompanied by another officer, responded to the Defendant's home a short time later and spoke with the Defendant about how she came to possess the victim's items. After being given Miranda warnings, the Defendant told Officer Moore that she did not steal or take the jewelry, explaining instead that the victim had given her the jewelry as a gift and that she had pawned it. The Defendant indicated that she knew it was against policy to take gifts from clients, and though she accepted the jewelry anyway, she knew it was wrong to take it even if it was a gift.

Brittany Brown testified that she was a probation and parole officer with the Department of Correction and that she had prepared the presentence report in this case and had conducted a lengthy interview with the fifty-year-old Defendant. The report was entered into evidence.

Reviewing the report, Ms. Brown confirmed that she summarized therein the version of the events as the Defendant had relayed them to her. According to Ms. Brown's summarization in the report, the Defendant told her that one of the other housekeepers had approached her and given her four items of jewelry and that the Defendant did not think anything of it at the time. The Defendant informed Ms. Brown that she later pawned the jewelry when she needed money and that she was surprised by the jewelry's worth. The Defendant again acknowledged the facility's policy prohibiting employees from accepting gifts from residents. The Defendant said that she never would have accepted the items had she known they were stolen. The Defendant acknowledged to Ms. Brown "her poor decisions" and indicated that she was "committed to continuing to improve herself and to make amends for the difficulties she ha[d] caused in the lives of others."

Ms. Brown confirmed that the Defendant had no criminal record prior to this offense; at the time of this offense, the Defendant was forty-seven years of age. No new charges were indicated in the report.

Relative to her health, the Defendant reported that she suffered from anxiety and had been prescribed Zoloft for her condition, though she had stopped taking it due to her lack of insurance. The Defendant stated that when her insurance with her new employer would cover the medication, she intended to start it again. The Defendant also reported that following "major surgery" nine years prior, she had to relearn to walk, use the restroom, and perform other daily activities. The Defendant further indicated that she had two "hernia surgeries" and suffered from fibromyalgia.

Relative to her family history, the Defendant indicated that she had two adult children, a son who lived with her and a daughter who lived independently. The Defendant also indicated that she and her boyfriend were engaged and planned to marry by year's end. Finally, the Defendant conveyed that she did not maintain contact with her parents but that she would occasionally speak to some of her siblings.

The Defendant also informed Ms. Brown about her employment history. The Defendant had worked at Rubbermaid and Days Inn after her employment was terminated by Greenfield and worked with Kentucky Fried Chicken ("KFC") at the time she was interviewed, her employment beginning there in January 2019.

Finally, Ms. Brown testified that the Defendant was overall a low risk for re-offending based upon a Strong-R Assessment. Ms. Brown explained, "A Strong-R

Assessment calculates the risks and needs that an offender will have to basically re-offend and what would keep them from re-offending. What would help to assist them from re-offending." According to Ms. Brown, one factor for re-offending on the Strong-R Assessment that the Defendant scored in the high range was mental health, noting that this included the Defendant's reporting that she suffered from anxiety. Ms. Brown confirmed that the Defendant had received a high school diploma but did not have any education beyond the high school level, which placed the Defendant in the moderate range for re-offending. According to Ms. Brown, the remaining factors, such as friends, attitudes/behaviors, aggression, alcohol/drug use, residential, family, and employment, were all low.

The ninety-one-year-old victim testified that she had lived at Greenfield for approximately two and one-half years. According to the victim, the cleaning staff came to her apartment on Fridays to clean, performing such chores as changing the linens, waxing the furniture and floors, and taking the garbage out. The victim identified the Defendant as part of a three-woman team that used to clean her apartment. At the time of her employment, the victim viewed the Defendant as a nice person and friend, and she trusted the Defendant to clean, knowing the Defendant had "been cleared statewide to work at Greenfield."

The victim indicated that she did not realize that her jewelry was missing until an officer came to her room and showed her a picture of it. When the victim went to her jewelry box, the items were missing, though she had the only key. The victim explained, "[The officer] said this lady was wearing it and she said that the lady she cleaned for gave it to her . . . . [The officer] kept questioning her until she finally agreed that she had taken it." The officer told the victim to look around, and the victim discovered that more items had been taken. The victim averred that she was shocked because she believed that she was in a safe place and that her health began to decline after the grief and anguish caused by these events.

The victim denied ever giving any jewelry to the Defendant. The victim indicated that the jewelry was valuable both monetarily and sentimentally, some of it having been given to her by her late husband.

The victim read her prepared victim impact statement. In the statement, the victim expressed that she felt the Defendant had taken advantage of their "trusting relationship," noting that she was vulnerable after losing her husband of sixty-nine years. The victim stated that the Defendant had stolen her "most prized possessions" to make "a quick buck," explaining that she had planned to pass down these irreplaceable gifts from her husband and from her world travels to her family. The victim said that her "whole world was shattered by this woman" and that she was unable to trust anyone. The victim asked for

"the maximum sentence possible" to keep the Defendant from ever doing something like this again.

The fifty-year-old Defendant then testified. She stated that she worked at Greenfield for approximately four years as part of a team cleaning the residents' rooms. The Defendant was asked to relay the details of her verbal statement to Officer Moore. According to the Defendant, she admitted to Officer Moore that she pawned the jewelry but explained to him that she had received the jewelry from "[a]nother employee[,] . . . more than one." When asked why she did not tell Officer Moore who gave her the jewelry, the victim replied, "Because I felt bad, if I would have known—it just wasn't right, I wasn't thinking, it just happened so fast." The Defendant explained that "[i]t didn't matter" where the jewelry came from because "it was still wrong regardless."

The Defendant then expressed her "deep regret" and "highest remorse" to the victim. She apologized for her "one foolish selfish and stupid lapse" in judgment and "careless mistake" that hurt the victim and the victim's family. The Defendant said that she felt "shame" for her behavior and had "learned [her] lesson."

The Defendant confirmed that her employment with Greenfield was terminated due to this incident. According to the Defendant, after her termination, she sought and obtained unemployment benefits, and she also obtained employment through "a temp agency," working at "Rubbermaid, Bubble Barn, [and] Duncan and Sons." The Defendant indicated that she now had permanent employment with KFC in Oak Ridge, that she had been employed there for approximately seven months, that she worked six days a week between forty-two and forty-five hours per week, and that she made $9.00 an hour. The Defendant averred that "getting this case resolved" would allow her to get a promotion to earn more money, then getting paid $12.75 an hour, which in turn would help her make restitution payments. She provided documentation of her employment history.

The Defendant also presented two letters from KFC employees. The first letter was from Shelly Broyles, the Defendant's shift manager. Ms. Broyles described the Defendant as "a wonderful co-worker and friend." Ms. Broyles hoped the court saw "how sorry" the Defendant was for her behavior. According to the Defendant, Ms. Broyles wanted to come to court on the Defendant's behalf, but she had to work. The second letter was from Rowland Williams, the manager at KFC. Mr. Williams likewise was not present, his having to work. In the letter, Mr. Williams "recommended" the Defendant "as someone who . . . possesse[d] great character and judgment for the betterment of her community." Mr. Williams portrayed the Defendant as a hard worker who arrived early and "carrie[d] herself in a polite, respectable manner." He also noted that the Defendant was "a family-person, mom, who ha[d] always presented herself with levelheadedness, respect, and grace." Mr. Williams requested that the Defendant be given "the opportunity to correct her wrong doing in the past."

- 6 -

The Defendant asserted that if she were granted diversion, she would continue to work hard, pay restitution, and "do what [she] need[ed] to do to make it right." The Defendant said that she was "head of a family household" and that both of her adult children lived with her. When asked if there was anything further she wished to tell the victim or the court "about [her] remorse or desire to make this right," the Defendant once more stated that she was "very sorry."

On cross-examination, the Defendant admitted that she was trusted by Greenfield in her housekeeping capacity and that she had access to residents' rooms when they were not there. The Defendant affirmed that she was friendly with the victim and that the victim "was good to [her]." The Defendant acknowledged that her behavior violated both the victim's and her employer's trust.

The Defendant explained that all the cleaning staff "received gifts" despite the policy prohibiting such, that they exchange these gifts amongst themselves, and that she had participated in this type of exchange on two or three occasions. The Defendant again said that she did not know the jewelry was stolen and that she did not know the jewelry's value until she took it to the pawn shop. The Defendant acknowledged that the victim was "a vulnerable person" and apologized.

On redirect, the Defendant confirmed that her actions were wrong regardless of whether she was the one who stole the jewelry. The trial court then asked the Defendant for the name of the employee(s) who gave her the jewelry, but the Defendant would not name any specific individual. When asked why she would not name the employee(s), the Defendant replied that there were "a whole lot more involved than just [her]" and that she was "just doing what [she] need[ed] to do on [her] end." She maintained that she was not trying to lessen her responsibility and desired "to make this right."

On recross, the Defendant indicated that she did not know whether these other employees still worked at Greenfield. The Defendant was then asked, "But do you understand that if they still worked at Greenfield and you know that they've stolen stuff, that would still continue to violate the trust of the people at Greenfield?" The Defendant responded, "I understand that. But I was also let go immediately and didn't have the opportunity to even speak or even say anything."

The trial court observed that the Defendant was eligible for diversion and that it was required to review the diversion factors in rendering its decision. The trial court reviewed the information contained in the presentence report. The trial court commented that this was the Defendant's only criminal offense, which occurred when she was forty-seven years old, and that the Defendant had received a high school diploma. Relative to the Defendant's "health problems," the trial court remarked that the Defendant had reported "that she almost died of major surgery nine years ago," requiring her to relearn to walk,

use the restroom, and perform daily activities; that she had undergone two "hernia surgeries"; that she was diagnosed with fibromyalgia; and that she suffered from anxiety and took Zoloft, but was currently unable to obtain her medication due to lack of insurance. The trial court then went over the Defendant's family history, noting that the Defendant reported she did not maintain contact with her parents, her children lived with her, and she was engaged to be married. The trial court also recounted the Defendant's employment history, including her current employment at KFC, and noted that the Defendant had submitted documentation concerning her work history.

The trial court then reviewed details of the Defendant's Strong-R assessment. The trial court commented that the Defendant's mental health was classified as a high risk factor for re-offending and stated that it was "tak[ing] that into consideration." The trial court noted that in the assessment, it was stated that the Defendant "may have a mental health problem" and that "[s]he ha[d] participated in outpatient mental health counseling in the past."[2] In addition, the trial court commented that the Defendant's education was classified as a moderate risk factor for re-offending and that it was stated in the assessment, "She verbalizes a desire to obtain education but is not actively taking any steps." The trial court then remarked that though the assessment classified the Defendant's "friends" as placing her at low risk for re-offending, it also stated that she had "no friends during the most recent six months." Relative to the Defendant's lack of aggression noted in the assessment, the trial court observed that the Defendant "started getting agitated on the stand in cross-examination." Finally, the trial court indicated that it was "bother[ed]" by the family information contained in the assessment, notably that the "subject's partner has had criminal convictions during the most recent six months in the community." The trial court found that the Defendant's fiancé's criminal history was "concern[ing] . . . in terms of amenability to correction[] and in terms of her social history."

Assessing the amenability to correction factor, the trial court reviewed the various versions that the Defendant had given regarding her role in the offense. The trial court noted Officer Moore's testimony that when he questioned the Defendant, the Defendant told him that she received the jewelry directly from the victim. The trial court then noted that the Defendant testified at the hearing, claiming that she received the jewelry from another employee, "more than one," and that she did not know its value until she took it to the pawn shop. The trial court commented that the Defendant provided Ms. Brown with a third version, that being one of the housekeepers gave her four items of jewelry. The trial court did not find these differing versions offered by the Defendant to be credible. The trial court stated that it was placing "great weight" on the fact that the Defendant refused

---

[2] We feel constrained to observe that in the assessment, it was the Defendant herself who indicated that she may have a mental health problem, and not a conclusion reached by Ms. Brown. It was also noted therein that the Defendant had "no in-patient stays" for mental health problems and that she had never been officially diagnosed with any mental condition.

to name the other housekeepers involved and that this fact was telling regarding the Defendant's amenability to correction because these employees could still be working at Greenfield and engaging in this type of behavior. The trial court concluded that it was weighing the Defendant's amenability to correction "heavily against her."

Relative to the circumstances of the offense factor, the trial court noted that the ninety-one-year-old victim testified that she trusted the Defendant to clean her home whether she was present or not. The trial court noted that one of the stolen items had great sentimental value, its being given to the victim by her late husband, as well as its having significant monetary value given the amount the Defendant received for it at the pawn shop. The trial court also observed that the victim testified that other possessions had been stolen. The trial court found that this was an elderly victim who was "vulnerable."

The trial court found that the Defendant did not have a criminal record. The trial court concluded that the Defendant "ha[d] no social history" and "weigh[ed] against her" that she had no friends.[3] The trial court observed that she had employment history, but did not find that the Defendant had established her promotion at KFC was dependent upon her receiving diversion. The trial court then remarked that the Defendant's "physical health [was] not great" and that her mental health, which required treatment, "weigh[ed] against her."

Relative to the deterrence value to the Defendant and others, the trial court remarked that situations like this were why the Registry was created. The trial court commented, "We have individuals who are vulnerable in a home and this lady won't even tell us who they are. Who allegedly took this jewelry from the victim and they probably are still working there." The trial court also determined that judicial diversion would not serve the interests of the public because it would allow the Defendant to reapply for a similar position once her probation was completed. The trial court did not want to permit the Defendant the opportunity "to, at anytime, cause any harm to any vulnerable person again" through her work.

The trial court concluded that in light of the Defendant's amenability to correction, the circumstances of the offense, the deterrence value, and the interests of the public, the Defendant was not entitled to judicial diversion. The trial court observed that "at one point in time," it thought that the Defendant "had some remorse," but then she "started getting agitated on the stand" and would not provide the names of the other employees involved. According to the trial court, it had reviewed all of the diversion factors, saying "I've gone

---

[3] While the Strong R-assessment may have observed that the Defendant reported "no friends during the most recent six months," we feel constrained to note that letters from both of the Defendant's co-workers indicate to the contrary.

- 9 -

A through G,"[4] and determined that "the negatives greatly outweigh[ed] the positives." The trial court also ordered that the Defendant be placed on the Registry. The Defendant filed a timely appeal.[5]

## ANALYSIS

The Defendant contends that the trial court abused its discretion denying her judicial diversion by failing to give any weight to the Defendant's lack of criminal record and by unduly considering irrelevant circumstances, such as the Defendant's failure to implicate any potential co-defendants and the criminal history of her fiancé. According to the Defendant, this court should conduct a de novo review and grant her diversion. The State responds that the trial court did not abuse its discretion by denying diversion.

There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). However, simply because a defendant meets the eligibility requirements does not automatically entitle him or her to judicial diversion. State v. Bonestal, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). "Traditionally, the grant or denial of judicial diversion has been left to the sound discretion of the trial court." State v. King, 432 S.W.3d 316, 323 (Tenn. 2014). When deciding whether judicial diversion is appropriate, a sentencing court must consider seven common-law factors in making its determination. Those factors are:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, (f) the deterrence value to the accused as well as to others, and (g) whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); see also King, 432 S.W.3d at 326 (reaffirming that the Electroplating requirements "are essential considerations for judicial diversion"). The trial court must weigh the factors against each other and explain its ruling on the record. King, 432 S.W.3d at 326 (citing Electroplating, 990 S.W.2d at 229). If the trial court adhered to these requirements, "the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion." Id. at 319. This court will "not revisit the issue if the record contain[ed] any substantial evidence supporting

---

[4] A reference to the diversion factors outlined in Parker and Electroplating, which are discussed in more detail below.

[5] The Defendant does not challenge on appeal her placement on the Registry.

the trial court's decision." Electroplating, 990 S.W.2d at 229; see also Parker, 932 S.W.2d at 958.

A trial court is "not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness." King, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it." Id. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." Id. "In those instances, the appellate courts may either conduct a de novo review or . . . remand the issue for reconsideration." Id. at 328. A trial court can also abuse its discretion by considering and placing undue weight on an irrelevant factor. See State v. Chyanne Elizabeth Gobble, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *6 (Tenn. Crim. App. Aug. 12, 2015).

According to the Defendant, the trial court abused its discretion by denying judicial diversion "because it failed to consider and weigh all relevant factors and placed undue weight on irrelevant ones." Specifically, the Defendant alleges that the trial court erred by "merely reciting" the Defendant's lack of criminal history, "without giving any indication that it considered and weighed this highly relevant factor." The Defendant cites to State v. Thompson, a pretrial diversion case, in support of her argument that the trial court failed to properly consider and weigh the Defendant's lack of a criminal record. See 189 S.W.3d 260 (Tenn. Crim. App. 2005).

In Thompson, the prosecutor acknowledged the defendant's, who was in his fifties, lack of a criminal history but refused to place any weight on it, reasoning that "good citizenship [was] expected of all." Id. at 266-67. In concluding that the Thompson prosecutor abused his discretion by refusing to accord this factor any weight, this court reasoned,

> [A] defendant's criminal history—especially a lack thereof—is an important signifier of whether the defendant is likely to offend again. That is, a defendant's criminal history is a critical factor to consider in evaluating his or her amenability to correction: the primary focus required in evaluating a request for pretrial diversion.

Id. at 267. The court continued, "The prosecutor's refusal to give any favorable weight to this factor is a refusal to accord any significance to a factor repeatedly stressed by Tennessee's appellate courts as crucial to the comprehensive analysis required of district attorneys in assessing a request for pretrial diversion." Id.

- 11 -

"[J]udicial diversion 'is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion.'" King, 432 S.W.3d at 327 (quoting State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992)) (emphasis added in King); see State v. Cutshaw, 967 S.W.2d 332, 343 (Tenn. Crim. App. 1997) ("Tennessee courts have recognized the similarities between judicial diversion and pretrial diversion and, thus, have drawn heavily from the case law governing pretrial diversion to analyze cases involving judicial diversion."). If a prosecutor can abuse his or her discretion by refusing to accord a defendant's lack of a criminal history any weight in determining pretrial diversion, then it stands to reason that a trial court can likewise abuse its discretion in doing the same thing when making a judicial diversion determination. See State v. Edythe Christie, No. W2015-02485-CCA-R3-CD, 2016 WL 7495187, at *9 (Tenn. Crim. App. Dec. 30, 2016).

Though we agree with the Defendant's legal premise, her argument must fail. In reviewing the presentence report, the trial court commented that this was the Defendant's only criminal offense, which occurred when she was forty-seven years old. The trial court later delineated each of the seven Parker and Electroplating factors and, in specifically addressing the criminal history factor, stated that the Defendant did not have a criminal record. The trial court did not indicate the weight it was assigning to this factor. However, the trial court noted throughout its ruling when addressing each factor what factors weighed against the Defendant and why, as well as indicating at the conclusion of its ruling that it had reviewed all of the diversion factors, saying, "I've gone A through G," and determining that "the negatives greatly outweigh[ed] the positives." In addition, the trial court stated that it placed great weight on the Defendant's amenability to correction, as well as giving weight to the circumstances of the offense, the deterrence value to the Defendant and others, and the interests of the public.

The record does not support the Defendant's claim that the trial court made "a blanket statement" that it had considered all of the relevant factors without more. We believe that the record reflects that the trial court considered the Parker and Electroplating factors in rendering its decision and that it identified the specific factors applicable to the case before it, and that the trial court weighed the factors against each other and placed an explanation of its ruling on the record. See King, 432 S.W.3d at 326-27. To hold otherwise would require mathematical rigidity in a judicial diversion determination, something not required by the presumption of reasonableness and abuse of discretion standard of King. Insofar as the Defendant challenges the trial court's consideration of the appropriate factors and the trial court's compliance with the procedure requiring an explanation of its ruling on the record, we conclude that the trial court substantially complied with the procedures outlined in King. See State v. Henri Brooks, No. W2015-00833-CCA-R3-CD, 2017 WL 758519, at *8 (Tenn. Crim. App. Feb. 27, 2017) (holding same though "[t]he trial court did

not assign a mathematical weight to each factor, but discussed certain factors more exhaustively in imposing judgment").

The Defendant also submits that the trial court improperly weighed irrelevant factors, denying judicial diversion primarily because it found the Defendant unamenable to correction due to her failure to name who gave her the jewelry and the criminal history of her fiancé, which were irrelevant to her fitness for judicial diversion, according to the Defendant. A trial court can abuse its discretion by considering and placing undue weight on an irrelevant factor. See State v. Chyanne Elizabeth Gobble, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at *6 (Tenn. Crim. App. Aug. 12, 2015). According to the Defendant, the trial court abused its discretion by placing heavy emphasis on these irrelevant circumstances.

First, we note that the trial court discussed the Defendant's fiancé's criminal history during its review of the Strong-R assessment. The trial court indicated that it was "bother[ed]" by the family information contained in the assessment, notably that the "subject's partner has had criminal convictions during the most recent six months in the community." The trial court found that the Defendant's fiancé's criminal history was "concern[ing] . . . in terms of amenability to correction[] and in terms of her social history."

The Strong-R assessment, also referred to as a risk and needs assessment, was prepared by Ms. Brown and was attached to the presentence report. Ms. Brown explained, "A Strong-R Assessment calculates the risks and needs that an offender will have to basically re-offend and what would keep them from re-offending. What would help to assist them from re-offending." The Defendant lodged no objection to the information contained therein. Though the trial court may have taken some liberties with its review of the Strong-R assessment, we cannot say that the trial court considered irrelevant information when the Strong-R assessment is a tool prepared as part of the presentence report to be utilized in making just such a determination. In fact, before imposing sentence on a defendant, a trial court is required to consider, among other things, the result of a validated risk and needs assessment included in the presentence report. See Tenn. Code Ann. § 40-35-210(b). Furthermore, a defendant's home environment and marital stability have been held to be relevant considerations in a judicial diversion determination. See Cutshaw, 967 S.W.2d at 343-44. Here, the trial court reviewed the information contained in the Strong-R assessment and discussed at length throughout its ruling the different facts it found important to the Defendant's amenability to correction. The trial court did not unduly emphasize the Defendant's fiancé's criminal history as the Defendant asserts.

Turning to the Defendant's next assignment of error, we observe that the trial court, in rendering its determination, did make multiple references to the Defendant's failure to name the other employees who gave her the stolen jewelry. Relative to assessing the amenability to correction factor, which it weighed heavily against the Defendant, the trial

court reviewed the various versions that the Defendant had given regarding her role in this offense. The trial court observed that the Defendant had given one to Officer Moore, one to Ms. Brown, and yet another at the hearing. The trial court also noted that the Defendant claimed not to know the value of the jewelry until she took it to the pawn shop. From these facts, the trial court determined that the Defendant was not credible. The trial court also stated that it was placing "great weight" on the fact that the Defendant refused to name the other housekeepers involved and that this fact was telling regarding the Defendant's amenability to correction because these employees could still be working at Greenfield and engaging in this type of behavior.

Prior decisions of this court have recognized that a trial court's directive that a defendant cooperate with the police or divulge information may be violative of sentencing principles. See State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994) (requiring a defendant to participate in undercover activities was outside scope of the Sentencing Act as it was clearly not voluntary, was not reasonably related to any form of rehabilitation, and was unduly restrictive of the defendant's liberty). Nonetheless, in State v. Ruiz, the Tennessee Supreme Court, affirming a trial court's decision to deny early release, stated that "a refusal to identify the person who supplied the drugs that the defendant admittedly sold demonstrates deficiencies in his asserted feelings of remorse and contrition, and casts doubt upon his potential for rehabilitation." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citation omitted), overruled on other grounds by State v. Patterson, 564 S.W.3d 423, 433-34 (Tenn. 2018). In so concluding, the Ruiz court cited to this court's opinion in State v. Alexander A. Lee, wherein we held the same in the context of a trial court's decision to deny probation. No. W1999-01804-CCA-R3-CD, 2000 WL 1840077, at *4 (Tenn. Crim. App. Dec. 14, 2000). Prior to reaching our conclusion in Alexander A. Lee, this court noted that it would be improper for a trial court to deny alternative sentencing based solely upon a defendant's refusal to reveal the names of his sources. Id. (citations omitted).

Here, as in Alexander A. Lee, we are constrained to conclude that the trial court did more that deny diversion solely based upon the Defendant's unwillingness to reveal the names of the other employees involved. The trial court's ruling regarding the Defendant's amenability to correction indicates that it found the Defendant was not being truthful and candid with the court. This determination is supported by the record given the multiple different versions proffered by the Defendant, as well as her assertion that she was unaware of the jewelry's value. Lack of candor and untruthfulness support a denial of diversion, negatively impacting a defendant's amenability to correction. See State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999); State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994).

Moreover, though the Defendant pled guilty and professed to accept responsibility for her actions, the trial court felt that the Defendant had not fully accepted responsibility

for her criminal conduct. "[T]he failure of the defendant to admit guilt is not, in and of itself, a proper basis for denying diversion." State v. Oakes, 269 S.W.3d 574, 578 (Tenn. Crim. App. 2006). "However, there is a critical distinction between confessing guilt to a crime and accepting responsibility for wrongful conduct. Admitting that one's conduct complies with the elements of a criminal offense and accepting responsibility for wrongful conduct are not necessarily synonymous." Stanton v. State, 395 S.W.3d 676, 688-89 (Tenn. 2013). The failure to admit any wrongdoing or accept any responsibility is a relevant consideration to the denial of judicial diversion. Henri Brooks, 2017 WL 758519, at *9.

Accordingly, we cannot say that trial court considered irrelevant factors as the Defendant protests because her lack of candor, as well as her failure to accept responsibility, were relevant to an assessment of the Defendant's amenability to correction. In addition, while discussing it in the context of amenability to correction, the trial court remarked that these other employees could still be working at Greenfield and engaging in this type of behavior. Also, relative to the deterrence value to the Defendant and others, the trial court commented, "We have individuals who are vulnerable in a home and this lady won't even tell us who they are. Who allegedly took this jewelry from the victim and they probably are still working there." These considerations were certainly proper in the context of deterrence. See Alexander A. Lee, 2000 WL 1840077, at *4.

Accordingly, the trial court's decision in this case is afforded a presumption of reasonableness and reviewed for an abuse of discretion. The record in this case reflects that the trial court individually examined each of the relevant factors in denying Defendant's request for judicial diversion and stated its reasons on the record. The trial court explained that although the Defendant was eligible for judicial diversion, certain factors weighed against the Defendant, including her amenability to correction, the circumstances of the offense, the deterrence value to the Defendant and others, and the interests of the public.[6] The victim in this case was an elderly individual who trusted the Defendant to clean her apartment; the Defendant was an employee who cleaned for many elderly and vulnerable residents at the facility. The Defendant gave varying accounts regarding her responsibility for this crime and refused to identify the other employees involved, some of whom potentially still worked at Greenfield. Ultimately, the victim determined that multiple items were missing from her room, and she relayed that the items pawned by the Defendant were of both sentimental and monetary value. In addition, the Defendant admitted that she had engaged in this type of exchange with the other employees on prior occasions. Also, the trial court expressed its desire that the interests of the public be protected from allowing the Defendant to reapply for a similar position. We conclude

---

[6] Though we have some concerns regarding the trial court's findings about the Defendant's mental health and her lack friends, these considerations did not appear to factor heavily into the trial court's decision to deny diversion.

that trial court did not abuse its discretion and that there is substantial evidence in the record to support the trial court's denial of judicial diversion.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE